STATE of Wisconsin, Plaintiff-Respondent,†

v.

Aaron LINDH, Defendant-Appellant.

Court of Appeals

*No. 89–0896–CR. Submitted on briefs December 8, 1989.—Decided May 24, 1990.*

(Also reported in 457 N.W.2d 564.)

† Petition to review granted.

For the defendant-appellant the cause was submitted on the brief of *Kenneth P. Casey,* assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, by *Sally L. Wellman,* assistant attorney general.

Before Gartzke, P.J., Sundby and Dykman, JJ.

GARTZKE, P.J. Aaron Lindh appeals from a judgment of conviction of two counts of first-degree murder, sec. 940.01(1), Stats. 1985, while using a dangerous weapon, sec. 939.63(1)(a)2, Stats., of attempted first-degree murder while using a dangerous weapon, sec. 939.32(1)(a), and of carrying a firearm in a public building, sec. 941.235(1), Stats.

On January 15, 1988, Lindh carried a shotgun into the City-County Building in Madison, Wisconsin, and shot three people he did not know. When deputy sheriff Louis Molnar ordered Lindh to stop and put down his weapon, Lindh advanced on him while shouting "Shoot me! Kill me!" Lindh and Molnar simultaneously fired at each other. Lindh was hit and disabled. Molnar was not hit. Two of Lindh's three victims died.

Lindh pled not guilty by reason of mental disease[1] to all charges. A bifurcated trial was held pursuant to sec. 971.165, Stats. He pled guilty to the firearm charge and the dangerous weapon penalty enhancer and was found guilty of the other charges by a jury. The jury then found Lindh did not have a mental disease at the time of the shootings. Lindh challenges only that finding.

Lindh contends that the trial court erred by refusing to suppress statements he made to a psychiatrist. We conclude that the court did not err in that regard. Lindh also contends that he should have been allowed to cross-examine the psychiatrist about pending investigations into his sexual misconduct with patients. We agree, and because the error was prejudicial, we reverse the judgment and remand for a new trial as to Lindh's mental state.

---

[1]Section 971.15, Stats., provides:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

(2) As used in this chapter, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

## 1. FACTS

Lindh was taken to the hospital after deputy Molnar shot him, was placed under general anesthesia, and underwent surgery which ended at 3:30 p.m. Lindh was then sedated, placed in intensive care, and given pain medication.

During the afternoon, the prosecutor assigned to the case retained Dr. Leigh Roberts, a psychiatrist with a specialty in forensic psychiatry. The prosecutor told Dr. Roberts that a shooting had occurred, that Lindh was in custody, and that questions might be raised regarding his mental state during the shooting. The prosecutor asked Dr. Roberts to interview Lindh.

At 8:34 p.m., two Madison detectives questioned Lindh in intensive care. They questioned him for thirty minutes after first identifying themselves and warning him in accordance with *Miranda v. Arizona,* 384 U.S. 436 (1966).[2] They concluded the interview when Lindh said he was thirsty and was starting to feel some pain.

At 9:33 p.m., Dr. Roberts came to Lindh's hospital room. At the suppression hearing, Dr. Roberts testified as follows:

---

[2]One of the detectives read Lindh his rights from a card which said: "You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have a lawyer present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed at county expense to represent you before any questioning, if you so wish. You can decide at any time to exercise these rights and not answer any questions or make any statements." The detective asked Lindh after each sentence whether he understood it. Lindh each time stated that he did. When asked whether he was willing to talk with those rights in mind, Lindh responded, "Sure."

**Q:** When you first contacted [Lindh], what did you tell him, if anything?

**A:** When I first contacted him, I introduced myself. I explained that you [the prosecutor] had sent me. I explained the purpose of the examination, related to my determining his mental state as of that time and as of earlier that day. As I went through each of the items with him, I asked him if he understood and got a verbal affirmative response from him. I explained to him that our discussion was not of a confidential nature, that anything that was reported could subsequently be reported to other persons, since it was done at the request of the District Attorney's office and it related to legal matters. I explained to him that he did not have to speak with me. I asked him if he had an attorney. He indicated, "No." I asked him if he wanted an attorney before he spoke with me. And, again, he indicated, "No." I asked him if he understood that he was giving up his right to have an attorney before talking with me, if he did talk with me. And he indicated he did. I explained to him that the concerns about his mental state had to do with was he at risk to harm himself.

. . ..

I explained to him, also, that the purpose of the examination had to do with his mental abilities now, in terms of talking with people, and my assessment of his mental abilities that afternoon, and that that might be used later in a court process, concerning was he mentally responsible.

. . ..

**Q:** Did you indicate to him, sir, that if he couldn't afford to hire an attorney, one would be provided for him, before you talked to him?

**A:** No. I did not.

Dr. Roberts did not tell Lindh that he could stop the questioning at any time.

Dr. Roberts asked Lindh if he could recall what had happened earlier that day in the City-County Building. Lindh said he had a limited amount of recall but remembered shooting three people. When asked why, Lindh responded that he did not know and that he did not want to discuss the details at that time. Dr. Roberts then suggested that Lindh might want to reconsider whether to talk at all because he did not have a lawyer. Lindh responded by closing his eyes. Dr. Roberts stated that he would leave, wait a few minutes, and then return.

Dr. Roberts left Lindh and returned twelve minutes later. Lindh said he understood that he did not have to talk with Dr. Roberts and understood why Dr. Roberts was there. Dr. Roberts then mentioned the absence of a lawyer but Lindh said he would talk. Dr. Roberts asked Lindh about his background, what had led to the shooting incident, and his past and present mental state. This second meeting lasted for about thirty minutes.

On March 8, 1988, Dr. Roberts learned that the University of Wisconsin hospital was investigating a claim that he had engaged in sexual misconduct with a female patient. He knew of sec. 940.22, Stats., which provides criminal penalties for the sexual exploitation of a patient by a therapist. In May 1988, he learned that the Medical Examining Board was investigating charges against him. The complaint before the board alleged several incidents of sexual misconduct by Dr. Roberts with three female patients.

On April 8, 1988, Lindh moved to suppress his statements to the police and Dr. Roberts because they were obtained in violation of *Miranda.* The trial court denied the motion by decision and order filed September 15, 1988.

Meanwhile, on June 22, 1988, Dr. Roberts again interviewed Lindh in the Dane county jail. The next day, the hospital referred the investigation of Dr. Roberts' sexual misconduct to the Dane county district attorney. The district attorney immediately sought to have a special prosecutor appointed. The circuit court made the appointment on June 28, 1988. Dr. Roberts learned of the appointment on July 8, 1988. On August 17, 1988, he issued a report concluding that Lindh did not suffer from a mental disease on the day of the shooting. On August 22, 1988, he again interviewed Lindh.

The state moved the trial court *in limine* to prohibit any inquiry at trial about the allegations of sexual misconduct against Dr. Roberts or any possible ramifications of the allegations. The court granted the motion.

At the mental disease stage of the trial, Dr. Ezra Griffith testified on behalf of Lindh. Dr. Griffith is a specialist in forensic psychiatry and an associate professor of psychiatry at Yale University. He opined that at the time of the shooting Lindh suffered from a mental disease. He was in the throes of a psychotic state diagnosed as a brief reactive psychosis. As a result of that state, Lindh lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

Dr. Griffith also testified that long before the shooting Lindh had suffered from mental disorders. Dr. Griffith characterized Lindh's long-term disorder as a mixed personality disorder which fit into two diagnostic categories: borderline personality disorder and narcissistic personality disorder. He then described the relationship between the long-term disorders and Lindh's psychotic state at the time of the shooting. He testified that brief reactive psychoses are known complications of each personality disorder.

Dr. Roberts was the state's principal witness. While being qualified in the presence of the jury as an expert witness, Dr. Roberts noted that he had "eight grandchildren up to nearly the age of Mr. Lindh," that he was a faculty member of the University of Wisconsin Medical School, an adjunct faculty member of the San Francisco Theological Seminary, and on the board of trustees of North Central College, that he had served on various committees dealing with mental retardation, rehabilitation, and the sex crimes law, that he had chaired conferences on mental health in relation to religion, rehabilitation, and law, and that he had recently been honored "as essentially the mid-west psychiatrist of the year." He had testified "several hundred times" on the mental condition of persons who have committed crimes.

Dr. Roberts opined that Lindh was not suffering from a mental disease at the time of the shooting. He had an antisocial personality disorder but that is not a mental disease. He had neither a borderline nor a narcissistic personality disorder. He did not suffer a brief reactive psychosis.

Dr. Roberts implied he had an advantage in diagnosing Lindh's mental state because he had interviewed Lindh within hours of the crime. When asked how important it was to see Lindh on the day of the shooting, Dr. Roberts testified:

> It's very important. It's not always essential : . ..
> However, it is very helpful to have had the first hand experience and to be able to do a professional evaluation that close in time to the actual event and to see what he looked like in that immediate period, that particular day within just a few hours of the time that [the] behavior occurred . . ..

The state also called Dr. Frederick Fosdal, a psychiatrist, as an expert witness. Dr. Fosdal was present dur-

ing the testimony of the other two doctors and had available to him most of the same materials they relied upon. He testified that he had twice talked with Lindh for three hours and the information he obtained during those interviews was identical to that the other doctors obtained.

Dr. Fosdal opined that Lindh was not suffering a brief reactive psychosis on the day of the shootings. Lindh had no mental disease on that day. He agreed with Dr. Griffith that Lindh fit the category of mixed personality disorder. He conceded that Lindh might have the traits of both a narcissistic personality disorder and a borderline personality disorder. He agreed that brief reactive psychoses are possible complications of each disorder and that a brief reactive psychosis is a mental disease.

The jury found that Lindh was not suffering from a mental disease at the time of the shootings in the City-County Building on January 15, 1988. The trial court entered the judgment of conviction from which Lindh appeals.

## 2. VIOLATION OF MIRANDA RIGHTS

The prosecution stipulated that Dr. Roberts acted as an agent of the police when he initially questioned Lindh after his surgery. As a police agent, Dr. Roberts was required to give *Miranda* warnings.

Lindh argues that Dr. Roberts gave him insufficient *Miranda* warnings when interviewing him on the day of the shooting. Lindh notes that Dr. Roberts failed to advise him that he had the rights to have counsel appointed for him if he could not afford counsel and to cut off questioning at any time. He also argues that Dr. Roberts failed to scrupulously honor Lindh's invocation of his right to remain silent.

The state denies that Lindh's *Miranda* rights were violated. It argues in the alternative that the privilege against self-incrimination does not apply to the mental disease phase of a bifurcated trial. We conclude that Lindh's *Miranda* rights were not violated. We therefore do not reach the state's alternative argument.

That Dr. Roberts gave Lindh incomplete *Miranda* warnings is undisputed. However, Lindh admits that a detective had given him a complete set of warnings an hour before Dr. Roberts arrived. Lindh ended his conversation with the detectives by stating that he was thirsty and feeling some pain, not by invoking his right to remain silent or his right to an attorney. When Dr. Roberts arrived, he explained to Lindh that he had the right not to talk and asked Lindh if he wanted counsel before questioning.

Given the complete *Miranda* warnings to Lindh an hour earlier, we conclude that Dr. Roberts gave him "the now familiar *Miranda* warnings . . . *or their equivalent.*" *California v. Prysock,* 453 U.S. 355, 360 (1981) (emphasis in original) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 297 (1980)). "It would be strange indeed for [a] court to hold that, where within the space of a few hours a defendant has been properly advised of his rights, a subsequent confession would be vitiated by an admonition that was somewhat less than technically perfect." *Grennier v. State,* 70 Wis. 2d 204, 213, 234 N.W.2d 316, 321 (1975). Here only an hour intervened between Lindh's being properly advised and the less than complete admonitions.

Lindh argues that he invoked his right to remain silent by telling Dr. Roberts that he did not want to discuss the details of the shootings and by closing his

eyes when Dr. Roberts said he might want to reconsider whether to have an attorney present. We disagree.

Lindh did not invoke his right to remain silent but rather expressed initial reluctance to discuss a topic. *People v. Galimanis,* 765 P.2d 644, 647 (Colo. Ct. App. 1988), *cert. granted,* 783 P.2d 838 (Colo. 1989). Dr. Roberts gave Lindh a few minutes to reconsider whether he wanted to talk at all and whether he wanted an attorney. Lindh acquiesced by closing his eyes. He at no time stated he did not wish to talk or that he wanted an attorney. When Dr. Roberts returned, Lindh agreed to talk, answered background questions, and then freely discussed details of the shootings. As in *Galimanis,* "[t]here is nothing in the record to show that his comments were coerced or involuntary in any way, or that his responses were the result of surreptitious mental invasion." *Id.* (citing *Early v. Tinsley,* 286 F.2d 1 [10th Cir. 1960], *cert. denied,* 365 U.S. 830 (1961)).

Having concluded that Lindh's *Miranda* rights were not violated, we need not and do not decide whether statements taken in violation of *Miranda* must be suppressed in the mental disease phase of a bifurcated trial.

## 3. IMPEACHMENT OF PSYCHIATRIST

Lindh argues here, as he forcefully argued to the trial court, that he should have been allowed to cross-examine Dr. Roberts about the pending investigations concerning his alleged sexual misconduct with patients. Lindh avers that the error prejudiced him and violated the confrontation clause of the sixth amendment to the United States Constitution. We conclude prejudicial error occurred and do not reach the constitutional question.

The trial court precluded Lindh's cross-examining Dr. Roberts regarding the investigations on grounds that the matter was irrelevant to the sanity issues and did not support Lindh's theory that Dr. Roberts was biased. We will sustain the exclusion of evidence on relevancy grounds unless the trial court abused its discretion. *Rogers v. State,* 93 Wis. 2d 682, 689, 287 N.W.2d 774, 777 (1980). "The proper standard for the test of relevancy on cross-examination is not whether the answer sought will elucidate any of the main issues in the case but whether it will be useful to the trier of fact in appraising the credibility of the witness and evaluating the probative value of the direct testimony." *Id.* In Wisconsin, any relevant matter may be inquired into on cross-examination without regard to the scope of direct examination. *Id.*

Lindh contends that the evidence of the pending investigation was relevant to Dr. Roberts' truthfulness. He asserts that the evidence tended to show bias because Dr. Roberts faced possible criminal charges and might want to curry favor with the prosecutor and affected his credibility as a supposedly "impartial professional who is just rendering an objective opinion." The state responds that any connection between the pending investigations and Dr. Roberts' professional opinion on Lindh's mental state is far-fetched. The criminal investigation had been referred by the Dane county district attorney to a special prosecutor. No criminal charges had been brought against Dr. Roberts. No deal had been struck.

However, in this case, as in *Rogers,* the credibility of the witness whose impeachment was disallowed was an unusually important factor. *Rogers,* 93 Wis. 2d at 691, 287 N.W.2d at 778. Although Dr. Roberts was not the state's only expert witness, he implied that he was situ-

ated advantageously because he was the only psychiatrist who saw Lindh on the day of the shootings. He disputed each contention of Lindh's expert. And his profession and livelihood could be jeopardized if he were convicted of sexual misconduct with a patient.[3]

> A trial court should be particularly solicitous of cross-examination intended to disclose bias or prejudice; e.g., a broad opportunity for examination should be allowed if its objective is to establish that an adverse witness in a criminal matter is giving his testimony in anticipation of favorable personal treatment, such as, police leniency by the state . . ..
> . . . The mere possibility of future criminal charges is a sufficient basis to explore the motives of the witness on cross-examination [and to] place his apprehensions thereof before the jury.

*State v. Chesnut*, 621 P.2d 1228, 1233 (Utah 1980), *disapproved on other grounds, State v. Crick*, 675 P.2d 527, 531 (Utah 1983).

While the record discloses no direct evidence that any state authority threatened or promised anything to Dr. Roberts, the jury could have reasonably inferred that a witness in the position of Dr. Roberts would perceive that he would benefit if he testified against Lindh or that he would suffer retaliation if he testified in favor of Lindh. The jury could consider those inferences strengthened by the circumstances of Lindh's crime.[4] Whether or not the trial judge or the judges of the court of appeals would draw those same inferences is not the

---

[3]A "therapist" (which includes a physician) "who intentionally has sexual contact with a patient . . . during any ongoing therapist-patient . . . relationship" is guilty of a class D felony. Sec. 940.22(2), Stats.

[4]Lindh killed two county employees and attempted to kill an employee of the state's justice department.

question. We leave such matters to juries if the inferences are reasonable.

We conclude the trial court abused its discretion by not permitting cross-examination of Dr. Roberts regarding the pending investigations of sexual misconduct. The jurors were entitled to know the facts from which they could reasonably infer possible bias on the part of the state's most important witness in the mental disease phase of Lindh's trial. They should have heard evidence useful to them "in appraising the credibility of the witness and evaluating the probative value of the direct testimony." *Rogers,* 93 Wis. 2d at 689, 287 N.W.2d at 777.

The error prejudiced Lindh. If the jury had disbelieved Dr. Roberts, they could have relied upon the other expert for the state, Dr. Fosdal. His testimony was significantly more guarded than Dr. Roberts'. Dr. Fosdal agreed with Dr. Griffith that Lindh fit the category of mixed personality disorder and conceded Lindh might have the traits of narcissistic and borderline personality disorders. Dr. Fosdal conceded that brief reactive psychoses are known complications of the latter two disorders. If the jury had been given reason to doubt Dr. Roberts' diagnoses, it could have concluded Lindh had suffered a brief reactive psychosis and therefore a mental disease.

A reasonable possibility exists that the error contributed to the jury's finding that Lindh did not suffer from a mental disease at the time of the shootings. That being the case, we cannot find that the error was harmless. *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985).

We conclude the second phase of the bifurcated proceeding must be retried. We do not reach the issue

whether the error deprived Lindh of his rights under the confrontation clause of the sixth amendment. *See id.* at 533, 370 N.W.2d at 227 (appellate court need not address claim of constitutional error if relief available on statutory or common law grounds).

*By the Court.*—Judgment reversed and cause remanded for a new trial as to whether Lindh is not guilty of the charges by reason of mental disease or defect.