In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1171

BRUCE N. BROWN,

*Petitioner-Appellant,*

*v.*

STEVE WATTERS,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:06-cv-00753-LA—**Lynn Adelman**, *Judge.*

ARGUED DECEMBER 5, 2008—DECIDED MARCH 19, 2010

Before RIPPLE, KANNE and TINDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 1998, a Wisconsin court ordered that Bruce Brown be committed civilly as a "sexually violent person" ("SVP") pursuant to Chapter 980 of the Wisconsin Statutes. In 2006, Mr. Brown filed a petition for habeas corpus in the United States District Court for the Eastern District of Wisconsin. He contended that his continued state custody deprived him of his right to due process of law. The district court denied the writ but issued a certificate of appealability on that issue. For the

reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

Since 1974, Mr. Brown has been incarcerated frequently for crimes that are sexual in nature.[1] Between 1974 and

---

[1] The record of Mr. Brown's commitment proceedings in Wisconsin was not presented in the district court. It was offered by counsel for the State, with the caveat that, because "the sole claim in Brown's petition is unexhausted and does not state a constitutional violation, [the State] does not believe that any of the transcripts are relevant to the resolution of Brown's petition at this time." R.11 at 5. The district court declined to order preparation of the transcripts or other state record evidence.

We determined that, in order to properly review the due process challenges raised by Mr. Brown with regard to the scientific evidence presented at his commitment trial, review of the state court record was appropriate. Although we generally decline to supplement the record on appeal with materials not before the district court, we have not applied this position categorically. *See, e.g.*, *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 n.2 (7th Cir. 2005) (in habeas case, supplementing the records with certain state court documents and otherwise accepting the parties' undisputed representations about the content of unprovided records); *accord Thompson v. Bell*, 373 F.3d 688, 690-91 (6th Cir. 2004) (in habeas case, acknowledging

(continued...)

1978, his actions resulted in convictions for attempted sexual perversion and several counts of first-degree sexual assault. Three of his later offenses were committed while he was on parole in connection with the 1974 offense and involved serious threats to the victims' safety. The charging document for a 1978 case, for example, indicates that Mr. Brown committed the offense while threatening the victim with a knife as she lay in her bed with her young grandchild next to her. In February 1984, just two months after his release from custody in connection with his prior offenses, Mr. Brown committed two other serious crimes against two separate victims within the space of four days; the first of these acts, committed on a juvenile with use of a knife, resulted in another conviction for first-degree sexual assault and a sentence of 20 years' imprisonment. The second offense of reckless endangerment resulted in a sentence of three years' imprisonment, to be served consecutively.[2]

---

[1] (...continued)
that "courts of appeals have the inherent equitable power to supplement the record on appeal, where the interests of justice require" and collecting cases), *overruled on other grounds*, 545 U.S. 794 (2005). "In the interest of completion," *Ruvalcaba*, 416 F.3d at 562 n.2, we ordered *sua sponte* the parties to supplement the record in this case with the record before the state appellate court. The parties have done so, and we have conducted a full review of Mr. Brown's commitment record.

[2] The records introduced at his Wisconsin commitment proceeding also reveal a significant history of other non-sexually-
(continued...)

As his mandatory release date approached in 1996, the State declined, for reasons undisclosed by the record, to file a petition to have Mr. Brown committed as a SVP pursuant to Chapter 980. Consequently, Mr. Brown was released on parole in 1996. Shortly thereafter, his parole again was revoked, and he was returned to state custody. According to the state court records, his parole revocation violations included using alcohol, marijuana and cocaine and staying overnight at an unapproved residence. He again was released from custody, this time with an electronic monitoring device, but he cut it off and absconded. He was out of custody for more than a year before he again was apprehended.

In addition to his conduct while out of prison, Mr. Brown's custodial records reveal that he received approximately 100 conduct reports, several of which related to sexual conduct. The incidents included an occasion where Mr. Brown made a sexually suggestive comment to a nurse during a physical examination and numerous incidents where he was disciplined for conduct with a visitor, such as inappropriate touching, "excessive kissing and hugging" or "fondling a visitor's breasts." Wis. R.92 at 54.[3]

---

[2] (...continued)
based offenses including, among other things, burglary, possession of a controlled substance, carrying a concealed weapon and attempted armed robbery.

[3] We shall use the abbreviation "Wis. R." to refer to docket entries in the state court commitment proceeding that were not
(continued...)

**B.**

In 1998, as Mr. Brown's new release date neared, Wisconsin began Chapter 980 proceedings, seeking to have him committed civilly as a SVP. After extensive pretrial proceedings challenging various proposed experts, proffered testimony and supporting documents, the matter was tried to a jury. *See* Wis. Stat. § 980.05(2) (providing that civil commitment may be tried to a jury at the request of the State or the respondent).

In support of its case, the State called Dennis Doren, Ph.D., a clinical psychologist employed by the Wisconsin Department of Corrections who had been working with sex offenders since 1983. Dr. Doren testified that he had reviewed approximately 1,500 pages of documents from Mr. Brown's corrections record, including presentence investigation reports, social worker reports, social history information, treatment behaviors, disciplinary reports and other similar materials. Dr. Doren testified that, after analyzing the documents available to him, he had diagnosed Mr. Brown with two conditions that he believed satisfied the Wisconsin standard of a "mental disorder,"[4] namely, a paraphilia not otherwise specified involving nonconsenting persons ("paraphilia

---

[3] (...continued)
made a part of the record in the district court proceeding and thus have no separate federal record number.

[4] *See* Wis. Stat. § 980.01(2) (defining a "mental disorder" for purposes of the SVP statute as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence").

NOS nonconsent") and Antisocial Personality Disorder ("APD").

With respect to the paraphilia diagnosis, Dr. Doren began by noting that the term generally describes a condition that involves "recurrent, intense sexual fantasies, sexual urges, and[/]or behaviors" involving "something other than consenting adults." Wis. R.94, Tr.Z at 6. In reaching the specific paraphilia NOS nonconsent diagnosis, Dr. Doren testified that he had relied upon a number of facts in Mr. Brown's record. First, Dr. Doren noted that, at various times, Mr. Brown "effectively acknowledged a sexual problem," *id.* at 10, that he had "given . . . to God," *id.* at 11. Next, Dr. Doren found significant that one of Mr. Brown's offenses occurred after "he had sex twice earlier in the day," *id.* at 11; the behavior pattern suggested that Mr. Brown was not simply looking for a "sexual outlet," since this was available to him with consenting partners, *id.* at 18. This evidence, coupled with Mr. Brown's documented sexual arousal during the attacks, was instead indicative of a specific interest in nonconsensual sex. *See id.* at 13, 18. In addition, the speed with which Mr. Brown returned to his criminal sexual conduct after being released suggested to Dr. Doren that Mr. Brown "is driven towards the behavior despite the fact [that he] has had a consequence for it." *Id.* at 13. Although Mr. Brown's offense pattern began as primarily non-sexual in his youth, his later criminal history involved offenses that were mostly sexual in nature, demonstrating a "continued ambush toward . . . sex offending." *Id.* at 18. In addition to the record evidence that suggested that Mr. Brown could be diagnosed with paraphilia NOS

nonconsent, Dr. Doren also testified about clinical indica-
tors that he believed were not particularly pronounced
in Mr. Brown's case: no clear "script" from offense to
offense, no great diversity among victims and no
proclivity for offending in circumstances in which he was
likely to be caught. *Id.* at 19-21. Evaluating the records in
light of "general indicators" from his clinical experience,
however, Dr. Doren's conclusion was that a diagnosis of
paraphilia NOS nonconsent was appropriate. *Id.* at 21. In
Mr. Brown's case, according to Dr. Doren, his paraphilia
"impairs his decision-making process and makes it more
difficult for him to control his behavior" and further
impairs his ability "for having a degree of empathy or
degree of remorse with his potential victims." *Id.* at 22.

With regard to the diagnosis of APD, Dr. Doren testified
that the condition was generally marked by "disregard for
and violation of the rights of others." *Id.* at 24. Mr. Brown's
criminal history, stretching back to age eighteen, both
sexual and non-sexual in nature, reflected a failure to
conform to social norms. His social, employment and
criminal history also reflected a characteristic impulsivity
such that his "life was about . . . . going from moment to
moment." *Id.* at 27. His crimes manifested aggression, and
he had further admitted that "he hit women for purposes
of controlling them on a regular basis to enforce their
compliance . . . with his desires." *Id.* at 29. In Dr. Doren's
view, Mr. Brown exhibited five of the seven criteria
identified in the Diagnostic and Statistical Manual of

Mental Disorders ("DSM")[5] as indicative of APD, although the DSM only requires three of seven be satisfied for a diagnosis. Dr. Doren also testified that APD affected both Mr. Brown's emotional and volitional capacity, causing a lack of remorse and an impairment of "his ability to control his behavior." *Id.* at 34.

On cross-examination, Dr. Doren admitted that the indicators used to reach a diagnosis of paraphilia NOS nonconsent were not identified in the DSM; instead, they were indicators Dr. Doren himself had identified to "bridge the gap or deficiency [that] . . . exist[s] in the DSM[]" that he had "offered to the field" in his own book on the subject of civil commitment. Wis. R.95, Tr.AA at 32, 34. When asked for a professional organization that accepted his clinical indicators for the diagnosis of paraphilia NOS nonconsent, Dr. Doren further admitted that there "isn't a single one." *Id.* at 33.

Finally, Dr. Doren testified that, in his view, each of Mr. Brown's conditions, that is, paraphilia NOS nonconsent and APD, "creates a substantial probability that he will engage in a sexually violent offense in the future." *Id.* at 18. He acknowledged that, although he employed actuarial risk assessment models, he also considered his

---

[5] All references to the DSM refer to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, published by the American Psychiatric Association in 2000. In the profession, the text is sometimes referred to as the DSM-IV-TR. For the sake of simplicity, we use the shorthand "DSM."

own set of clinical considerations not recognized in the literature. Based on these additional factors, he had made upward adjustments to the results of reoffense probabilities that resulted from use of the standardized actuarial models.

In response, Mr. Brown presented significant contrary expert testimony. First, he called Marc Goulet, who holds a doctorate in mathematics. Dr. Goulet testified about the limitations of the actuarial instruments Dr. Doren had used to make predictions about Mr. Brown's likelihood of recidivism. Dr. Goulet also questioned specific features of Dr. Doren's own methodology in interpreting an individual's scores. He concluded that the tools used were "fundamentally statistically flawed." Wis. R.96, Tr.BB at 39. Next, Mr. Brown called Lynn Maskel, M.D., a private forensic psychiatrist. Dr. Maskel testified that, because of its absence from the DSM, "psychiatrically the disorder [of paraphilia NOS nonconsent] does not exist." *Id.* at 75. Moreover, she considers APD a "circular diagnosis" that is "descriptive of many criminals, but doesn't really tell [an evaluator] much." *Id.* at 79. She further testified that in her experience, she never has seen a case of APD that she would identify as a "predisposing disorder within the operative definition in Wisconsin law," *id.* at 78; she noted that the psychiatric profession does not generally view individuals with APD "as people who have serious difficulty in controlling their behavior," *id.* at 83. Finally, the defense called Stephen Hart, Ph.D., a professor of clinical and forensic psychology. He had assisted in the development of one of the actuarial tools employed by Dr. Doren, but testified that, in his

view, "it's inappropriate to use actuarials to make absolute probability assessments." Wis. R.97, Tr.CC at 40. He further testified about the ethical obligations for psychologists and his view that Dr. Doren had "create[d] [a] fictional mental disorder[]" in identifying paraphilia NOS nonconsent. *Id.* at 56.

At the close of the evidence, the jury was instructed that, to declare Mr. Brown a sexually violent person, it must find that (1) he had been convicted of a sexually violent offense, (2) he had a mental disorder and (3) his disorder made him dangerous to others. *See* Wis. Stat. § 980.02(2). The court further instructed the jury that a mental disorder is "a condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence and causes serious difficulty in controlling behavior. Mental disorders do not include merely deviant behaviors that conflict with prevailing societal standards." Wis. R.98, Tr.DD at 10. Mr. Brown had requested a special verdict form identifying the mental disorder with which the jury concluded Mr. Brown was afflicted, laying out the elements of the statute separately and requiring the jury to affirmatively link the disorder to dangerousness, but the trial court denied his request. During deliberations, the jury sent out a note requesting a copy of the DSM, but the court denied the request.

The jury returned a general verdict declaring Mr. Brown a sexually violent person.

## C.

Mr. Brown appealed his commitment to the Court of Appeals of Wisconsin. In his direct appeal, Mr. Brown contended that he was denied due process by the admission of the challenged actuarial evidence and by failing to require proof of a recent overt act demonstrating his current dangerousness. He also pressed his challenge to the failure to provide his requested special verdict form. The Court of Appeals affirmed his commitment, and the Supreme Court of Wisconsin denied review.

## D.

After his direct appeal, Mr. Brown filed a petition in the district court seeking a writ of habeas corpus. R.1; *see* 28 U.S.C. § 2254. In his petition, Mr. Brown argued that he was denied due process when the state court relied on evidence that was not supported by scientific knowledge or accepted in the medical community. Mr. Brown also argued that his APD diagnosis was overly broad and could not justify his confinement. The district court concluded that Mr. Brown had failed to exhaust his state court remedies and stayed the petition. R.24. The court noted that, while dismissal is the ordinary fate for unexhausted claims, where a petitioner had good cause, the court had discretion to stay the federal proceeding. In its ruling granting a stay, the district court acknowledged that states have "considerable leeway" in defining mental abnormalities rendering an individual eligible for civil commitment, but that it "ha[d] some doubt" about the particular diagnosis in Mr. Brown's case. R.24 at 3.

Mr. Brown next apparently initiated a state habeas proceeding in Wisconsin state courts.[6] His petition was denied on procedural grounds.

Mr. Brown returned to the district court, where the stay was lifted and the proceedings reopened. After various additional submissions from the parties, the district court issued an order denying the federal writ. The district court held the claims to have been defaulted and found that Mr. Brown had not established cause and prejudice to excuse the default. Finding the issue of how to apply the fundamental miscarriage of justice exception to the procedural default rule more complicated, the district court determined that it need not be resolved because Mr. Brown's claims failed on the merits.

At the outset of its analysis, the court again noted that states have wide latitude in defining the relevant conditions for civil confinement and that the State's chosen criteria need not reflect the prevailing views in the mental health community. R.38 at 6. That he had a disorder, and that his disorder caused an inability to control behavior, the court ruled, was an issue sufficiently resolved against Mr. Brown by the jury. The court continued:

> This is not to say anything goes. I presume that a psychologist could render an opinion that an individual has a disorder characterized by an inability to avoid criminal behavior that is so

---

[6] The record of the Wisconsin collateral review proceeding is not before us.

irrational or unpersuasive that it would not sup-
port indefinite confinement consistent with the
Due Process Clause. However, this case does not
present such a diagnosis.

*Id.* at 7. The court held that, despite the contrary evidence
presented and despite its "novel[ty]," paraphilia NOS
nonconsent was "consistent with recognized diagnostic
principles." *Id.* It further noted that NOS categories are
listed in the DSM and that courts in Wisconsin and other
states have upheld commitments on the basis of such
diagnoses. The court found the challenge to the diagnosis
of APD similarly insufficient.

Mr. Brown, again proceeding pro se, filed a motion for
a certificate of appealability. The district court granted
the motion as to both the procedural and substantive
questions Mr. Brown presents to this court. In its order,
the court noted that its decision had been based on a
reading of the relevant precedent "as giving states a
tremendous amount of freedom in creating categories
of mental disorders so long as states define disorders
with reference to difficulty controlling behavior." R.47 at 4.
However, the court continued, "there must be some line
to be drawn." *Id.* The precise boundaries, the court con-
cluded, were matters about which reasonable jurists
could disagree.

## II

## PROCEDURAL DEFAULT

Mr. Brown challenges the diagnoses underlying his

commitment as a SVP. Mr. Brown concedes that he did not pursue this issue before the state courts.

The parties are in agreement, at this stage in the proceedings, that there is no remaining state court remedy, and that, accordingly, Mr. Brown's claims are procedurally defaulted. *See Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004) ("A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim.").

We are barred from considering procedurally defaulted claims unless the petitioner "can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice." *Johnson v. Hulett*, 574 F.3d 428, 430 (7th Cir. 2009) (internal quotation marks omitted). Mr. Brown argues that he has satisfied both of these exceptions to the procedural default bar.

**A.**

Mr. Brown first asserts that appellate counsel was ineffective for failure to raise his due process claims on direct appeal and that counsel's performance amounts to cause for any default. When preserved, meritorious claims of ineffective assistance can excuse default. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). A *constitutional* right to effective assistance must be the predicate to any such claim. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Mr. Brown provides no authority establishing a constitu-

tional right to appellate counsel to challenge a civil commitment. Where, as here, the right to counsel is a creation of state statute only, *see* Wis. Stat. § 980.03(2)(a), it follows that denial of that right does not establish the necessary cause to excuse the default of any underlying claims. *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (per curiam) (holding that, where there is no constitutional right to counsel, there can be no deprivation of effective assistance); *Coleman*, 501 U.S. at 752-54 (rejecting a claim that procedural default is excused by "ineffective assistance" when the proceedings in question did not entail a constitutional right to counsel).[7]

---

[7] Because we do not recognize a constitutional right to counsel in these circumstances, we cannot accept the cause-and-prejudice analysis urged by Mr. Brown, in which ineffective assistance provides the requisite cause. Accordingly, we also do not address whether the failure to raise attorney ineffectiveness in the petition procedure outlined by the Supreme Court of Wisconsin in *State v. Knight*, 484 N.W.2d 540 (Wis. 1992), is a sufficiently "firmly established" procedure that the failure to make use of it defaults the ineffectiveness claim. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) ("[O]nly a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." (internal quotation marks omitted)); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986) (holding that attorney effectiveness generally must be raised in state proceedings before it can serve as cause to excuse default of another claim).

**B.**

Mr. Brown further contends that he is actually innocent of SVP status, and thus that failure to excuse his default works a fundamental miscarriage of justice. We need not resolve squarely in this case whether the actual innocence exception to the general rule of procedural default applies in the context of civil commitment proceedings. In *Lambrix v. Singletary*, 520 U.S. 518, 524 (1997), the Supreme Court noted that its cases have "suggest[ed] that the procedural-bar issue should ordinarily be considered first." Nevertheless, added the Court, it did "not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be." *Id.* at 525. We believe that the situation before us counsels that we follow the latter course. The correct application of the actual innocence exception to civil commitment cases is a difficult one. We have no explicit guidance from the Supreme Court or from our sister circuits.[8] Moreover, because the parties are in agreement that the actual innocence exception applies (although they disagree on how it applies to the facts of this case), they have not briefed extensively all the nuances involved in the migration of this exception from the

---

[8] In *Levine v. Torvik*, 986 F.2d 1506, 1517 n.9 (6th Cir. 1993), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995), the Sixth Circuit expressed, in dictum in a footnote, that the exception could apply "where the constitutional violation demonstrated by [the petitioner] has resulted in the confinement of one who is actually not mentally ill."

criminal context to the civil commitment context.[9] We also believe that, given our recent decision in *McGee v. Bartow*, 593 F.3d 556 (7th Cir. 2010*)*, the constitutional norms applicable to a merits decision are clear and warrant affirmance. Therefore, as we did in *Johnson v. Pollard*, 559 F.3d 746, 752 (7th Cir. 2009), we shall pretermit a discussion of this aspect of the procedural default analysis and proceed to adjudicate the merits.[10]

---

[9] For instance, they have not addressed squarely the problem noted by our colleague in the district court as to whether the "new evidence" language of *Schlup v. Delo*, 513 U.S. 298, 327 (1995), is necessarily portable to the civil commitment context.

[10] Our course of proceeding here is not only in accordance with *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997), but in accordance with the established practice in the other circuits. *See Miller v. Mullin*, 354 F.3d 1288, 1297 (10th Cir. 2004) ("In the interest of judicial economy, [w]e need not and do not address these issues, however, because the case may be more easily and succinctly affirmed on the merits." (internal quotation marks omitted; modification in original)); *Wilson v. Ozmint*, 352 F.3d 847, 868 (4th Cir. 2003) (declining to decide the case on the basis of a procedural bar never raised by the state when the merits could be easily disposed of against the petitioner); *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003) (bypassing a "complicated question" of state law in a procedural default inquiry to resolve the case against the petitioner on the merits); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their

(continued...)

### III

### ANALYSIS

As briefed to this court, Mr. Brown's due process challenge has three elements. First, he challenges the diagnoses themselves. Mr. Brown claims that the diagnosis of paraphilia NOS nonconsent is lacking in scientific foundation and that the diagnosis of APD is overbroad and imprecise; in his view, the use of either diagnosis, alone or in combination, as the basis for a civil commitment, violates due process. He further contends that the diagnosis of APD cannot be used by the State of Wisconsin as a basis for confinement because the State does not allow a defendant to invoke the disorder as part of an insanity plea. Finally, he contends that Wisconsin's permissive standards for the admissibility of expert testimony should be replaced, in the context of civil commitment, with a *Daubert*-like test. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). We address these contentions in turn.

In our recent opinion in *McGee*, we set forth the controlling precedent in detail. 593 F.3d at 567-72. For the sake of brevity, we assume familiarity with *McGee*'s

---

[10] (...continued)

face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (seeing no need to "belabor" the "difficult question" of a procedural bar when the claim was easily resolvable against the petitioner on the merits).

discussion of the state of the law as it concerns the due process requirements for civil commitment.

**A.**

As in all habeas corpus proceedings under 28 U.S.C. § 2254, the successful petitioner must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For claims actually "adjudicated on the merits in State court proceedings," the statute commands that we undertake a limited review. *Id.* § 2254(d). We evaluate the record to discern only whether the state court's adjudication of the claim (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2).

These narrow and deferential standards of review do not apply here, however, because the relevant state courts did not adjudicate the claims presented on a federal habeas petition. *Cheeks v. Gaetz*, 571 F.3d 680, 684-85 (7th Cir. 2009). In such cases, we apply the general standard of review contained in 28 U.S.C. § 2243, which directs that we "dispose of the matter as law and justice require." *Id.*;[11] *see McGee*, 593 F.3d at 564.

---

[11] We have equated this standard with de novo review. *See Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

**B.**

We begin with Mr. Brown's challenge to the suffi-
ciency of his paraphilia NOS nonconsent diagnosis for
due process purposes. His argument is, in all material
respects, identical to the challenge raised by the peti-
tioner in *McGee*. In that case, we rejected the claim,
*McGee*, 593 F.3d at 579-81, concluding that the Supreme
Court has directed "that states must have appropriate
room to make practical, common-sense judgments" in
the arena of civil commitment, particularly as regards
qualifying mental conditions, *id.* at 580. We reviewed the
professional literature, and acknowledged the existence
of a significant debate about the validity, from a
psychiatric standpoint, of a paraphilia NOS nonconsent
diagnosis. We further noted, however, that "'the science
of psychiatry, which informs but does not control
ultimate legal determinations, is an ever-advancing
science, whose distinctions do not seek precisely to
mirror those of the law.'" *Id.* at 571 (quoting *Kansas v.
Crane*, 534 U.S. 407, 413 (2002)); *see also Kansas v. Hendricks*,
521 U.S. 346, 359 (1997) ("Legal definitions . . . which
must take into account such issues as individual respon-
sibility . . . and competency, need not mirror those ad-
vanced by the medical profession." (internal quotation
marks omitted; second modification in original)).

Despite the considerable leeway afforded to states in
this context, we acknowledged that:

> a medical diagnosis can be based on so little evi-
> dence that bears on the controlling legal criteria
> that any reliance upon it would be a violation of

due process. Therefore, a particular diagnosis may be so devoid of content, or so near-universal in its rejection by mental health professionals, that a court's reliance on it to satisfy the "mental disorder" prong of the statutory requirements for commitment would violate due process.

*McGee*, 593 F.3d at 577 (internal citation omitted). We concluded that the diagnosis of paraphilia NOS nonconsent did not cross this line. *Id.* at 580.

Although we accepted the diagnosis as minimally sufficient for due process purposes, we noted that the existence of a psychiatric debate about its validity "is a relevant issue in commitment proceedings and a proper consideration for the factfinder in weighing the evidence that the defendant has the 'mental disorder' required by statute." *Id.* at 581. We also noted that the "methodology and the outcome of any mental health evaluation offered as evidence is a proper subject for cross-examination, and we would expect that, in the ordinary case, such efforts would expose the strengths and weaknesses of the professional medical opinions offered." *Id.* at 577.

We again reject the challenge to the paraphilia NOS nonconsent diagnosis as so lacking in scientific validity that to rely upon it for civil commitment amounts to a denial of due process. Our conclusion is strengthened where, as here, able assistance of counsel *actually did expose* the professional debate to the jury and substantial contrary professional opinions were offered.

## C.

Mr. Brown next challenges the diagnosis of APD as constitutionally insufficient to support civil commitment. He claims the diagnosis is too imprecise and overbroad to provide meaningful evidence of a qualifying mental disorder. He also claims that the State of Wisconsin is judicially estopped from petitioning for commitment on the basis of APD when it has concluded that APD is not a permissible basis for a defendant to raise in an insanity plea.

### 1.

Chapter 980 of the Wisconsin statutes defines a SVP as:

> a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, or illness, *and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence.*

*Id.* § 980.01(7) (emphasis added). In a prior challenge, the State of Wisconsin determined that APD can serve as the "mental disorder" that supports civil commitment consistent with due process. *See In re Commitment of Adams*, 588 N.W.2d 336, 341 (Wis. Ct. App. 1998). Furthermore, we upheld that conclusion in a federal habeas challenge, governed by the deferential standards in 28 U.S.C.

§ 2254(d)(1), as a reasonable interpretation of *Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Foucha v. Louisiana*, 504 U.S. 71 (1992). *See Adams v. Bartow*, 330 F.3d 957, 963 (7th Cir. 2003). We reexamine the question now, when, for reasons explained above, our review is de novo.[12]

Like the petitioner in *Adams*, Mr. Brown contends that the Supreme Court's decision in *Foucha* suggests that APD is an invalid basis for civil commitment. *See* 504 U.S. at 78-79 (noting that Foucha had an antisocial personality, but ordering that his commitment be overturned as he was "not suffering from a mental disease or illness"). As we noted in *Adams*, we disagree that *Foucha* should be so read. In *Foucha*, the State of Louisiana had *conceded* that Foucha was not mentally ill, *id.* at 78; the Supreme Court was asked to decide whether, given a lack of mental illness, the state scheme that permitted his continued confinement on the basis of dangerousness alone was constitutional, *id.* at 82. In the case now before us, the State sought to prove—indeed, it elicited testimony from Dr. Doren stating directly—that APD *did* satisfy the

---

[12] We note that in *Adams v. Bartow*, 330 F.3d 957, 962 (7th Cir. 2003), because of the applicable standard of review, we were concerned only with the law that was "clearly established" at the time the Wisconsin courts decided the matter. For that reason, our consideration of *Kansas v. Crane*, 534 U.S. 407 (2002), was limited to its usefulness to "inform our understanding of" *Kansas v. Hendricks*, 521 U.S. 346 (1997). *Adams*, 330 F.3d at 962. Because we are not engaged in a deferential review in this case, we consider *Crane* and its development of the issues before us in full.

criteria under Wisconsin Chapter 980 of a qualifying "mental disorder."

Moreover, since *Foucha*, the Supreme Court has decided *Crane*, in which APD was one of two diagnoses supporting commitment. *See Crane*, 534 U.S. at 411. Although the Court remanded Crane's commitment, it did so on the basis of its conclusion that the Kansas commitment scheme had failed to require a finding of some inability to control behavior. *Id.* at 412-13. In the case before us, Dr. Doren testified that Mr. Brown's APD caused both emotional and volitional impairments, and the jury was instructed that in order to find him eligible for commitment, it must find that he suffered from a disorder, as defined by statute, that caused such an impairment.

Mr. Brown further contends that, even if the Supreme Court's treatment of APD itself does not indicate that it is an impermissible basis for civil commitment, the diagnosis fails to satisfy the due process requirements for civil commitment. By virtue of its over-inclusiveness, he contends, it is not "sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413.

Like the diagnosis of paraphilia NOS nonconsent, the diagnosis of APD is the subject of some significant professional debate. The existence of the disorder is not debated; indeed, it is a listed disorder with diagnostic criteria identified in the DSM. *See* DSM at 701. The subject of the professional debate as it has been

presented to us is not, therefore, whether it is a real or imagined diagnosis, but whether the diagnosis can bear the weight of a civil commitment.[13] As we noted in *McGee* and already have repeated here, however, the existence of a professional debate about a diagnosis or its use in the civil commitment context does not signify its insufficiency for due process purposes, particularly where, as here, that debate has been evaluated by the factfinder. *McGee*, 593 F.3d at 580-81. Mr. Brown introduced his own expert who testified that, in her professional view, APD did not satisfy the Wisconsin statutory requirement of a "mental disorder" that could serve as the predicate for civil commitment. *See id.* at 577 ("The meth-

---

[13] *See* Brett Trowbridge & Jay Adams, *Sexually Violent Predator Assessment Issues*, 26 Am. J. Forensic Psychol. 29, 46-47 (2008) (noting the considerable controversy about the diagnosis as a basis for commitment, the potential that it is "over-inclusive" and the studies showing poor inter-rater reliability); Shoba Sreenivasan et al., *Expert Testimony in Sexually Violent Predator Commitments: Conceptualizing Legal Standards of "Mental Disorder" and "Likely to Reoffend,"* 31 J. Am. Acad. Psychiatry & L. 471, 477 (2003) (noting that, although based on a "misinterpret[ation] [of] the law" as it currently stands, "[t]he use of [APD] to justify civil commitment is unlikely to find general acceptance among mental health professional groups"); Jack Vognsen & Amy Phenix, *Antisocial Personality Disorder is Not Enough: A Reply to Sreenivasan, Weinberger, and Garrick*, 32 J. Am. Acad. Psychiatry & L. 440, 442 (2004) (noting that while reliance on APD for a SVP determination is not precluded by law, neither is a "caffeine-related disorder[]," but that neither is "clinically appropriate").

odology and the outcome of any mental health evaluation offered as evidence is a proper subject for cross-examination, and we would expect that, in the ordinary case, such efforts would expose the strengths and weaknesses of the professional medical opinions offered.").

We acknowledge the studies demonstrating that a significant percentage of the male prison population is diagnosable with this condition. *See Crane*, 534 U.S. at 412 (citing statistics of forty to sixty percent).[14] Mr. Brown focuses on the prevalence of the disorder among those incarcerated as evidence that it does not distinguish a subgroup of offenders for whom preventive detention is appropriate. We believe his contention misses the mark. As the Supreme Court emphasized in *Crane*:

> [T]here must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish between the dangerous sexual offender whose serious mental illness, abnormality, or

---

[14] Mr. Brown suggests that, with this brief reference, the Court "suggested, albeit obliquely, that a diagnosis of APD alone might be too imprecise and overbroad to survive constitutional scrutiny." Appellant's Br. 30. We need not resolve that question, as the case before us does not involve a diagnosis of APD alone, but a diagnosis that couples APD with a sexually-related disorder. *See Crane*, 534 U.S. at 411 (noting the diagnoses of APD and exhibitionism).

disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.* at 413. That is, it is not the diagnosis alone, in the abstract, that is the focus in assessing the constitutionality of a civil commitment. Instead, we are concerned with how the mental disorder manifests itself in the individual, particularly as regards its effect on his ability to control his behavior. As we stated in *McGee*, "the factfinder has the ultimate responsibility to assess how probative a particular diagnosis is on the *legal* question of the existence of a 'mental disorder'; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination." *McGee*, 593 F.3d at 577 (emphasis in original). Although a clinical diagnosis by a professional plays a significant role in civil commitment, it is not the end of the matter. If for the offender in question, the condition of APD is serious enough to cause an inability to control sexually violent behavior,[15] the standards set by the Supreme

---

[15] As the Court of Appeals of Wisconsin noted:

[H]e brings his challenges in large part because the disorder affects so many who are not sexually violent. But, even assuming that the diagnosis of "antisocial personality disorder" is relatively common, the countless citizens who suffer from it are not *ipso facto* vulnerable to commitment under ch. 980, stats. Only the relatively few who *also* satisfy the remaining criteria of § 980.01(7), stats., may be found to be "sexually violent persons."

(continued...)

Court would be satisfied. Although the statistics that indicate that APD is a common condition in prison certainly warrant attention in light of *Crane*'s admonition, those figures do not demonstrate that the diagnosis *never* can bear the weight of a civil commitment consistent with due process.

Finally, we need not decide whether a diagnosis of APD *alone* suffices for due process purposes: Mr. Brown was diagnosed with a paraphilic disorder as well, and testimony at his commitment trial supported the view that both diagnoses caused, in Mr. Brown, significant emotional and volitional impairments. *Cf. Crane*, 534 U.S. at 411, 413 (noting the dual diagnoses of APD and exhibitionism, although citing the statistics about the prevalence of APD in the male prison population).

### 2.

Mr. Brown next contends that the State of Wisconsin is judicially estopped from asserting APD as the basis for civil commitment when it has refused to allow criminal defendants to raise the disorder as part of an insanity plea. *See* Appellant's Br. 33 (citing *State v. Lindh*, 457 N.W.2d 564, 568 (Wis. Ct. App. 1990), *rev'd on other grounds*, 468 N.W.2d 168 (Wis. 2001)). Judicial estoppel prevents a party from an "about-face," *Butler v. Village of Round Lake*,

---

[15] (...continued)
*In re Commitment of Adams*, 588 N.W.2d 336, 341 (Wis. Ct. App. 1998) (emphasis in original).

585 F.3d 1020, 1023 (7th Cir. 2009); it is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not . . . in another lawsuit repudiate that ground," *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005) (internal quotation marks omitted; modification in original). Among other requirements, however, in order for judicial estoppel to apply, "the latter position must be clearly inconsistent with the earlier position." *Urbania v. Cent. States, SE & SW Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005). We do not believe this to be the case here, where the *statutory* standards for insanity and SVP status are different in material respects. In particular, the definition of mental disease or defect in the insanity statute excludes "abnormalit[ies] manifested only by criminal or otherwise *antisocial conduct*." Wis. Stat. § 971.15(2) (emphasis added). That different substantive standards apply is not surprising in view of the different purposes of the two types of proceedings in which the question of a "mental disease or defect" or a "mental disorder" arise. A criminal proceeding adjudicates guilt and metes out punishment for prior offenses. A civil commitment proceeding instead invokes the police power of the state to protect the community from potentially dangerous persons who are mentally ill and, by reason of their disorders, may commit future harmful acts; it also asserts the state's *parens patriae* powers to provide critical services to those with mental illnesses. *See Addington v. Texas*, 441 U.S. 418, 425-29 (1979). The questions of "mental disease or defect" and "mental disorder," therefore, also aim at different ends. The first is a mechanism for avoid-

ance of criminal liability; while the second is primarily aimed at protection of both the individual and the public at large. A person whose mental disease or defect results in a successful insanity plea is relieved of criminal responsibility if he was afflicted with the mental disease or defect at the time of the commission of the offense. That same person *may* be a candidate for commitment *if* the commitment criteria of a mental disorder *and* dangerousness at the time of commitment are satisfied. This decision is subject to reevaluation periodically. *See* Wis. Stat. § 980.07. The statutory schemes therefore perform very different functions and understandably employ different standards.

In an attempt to cast an estoppel argument in a light appropriate to our task in this habeas proceeding, without arguing that judicial estoppel is itself an element of due process, Mr. Brown asserts that the State's "inconsistent" positions "further undermine[] the diagnosis's scientific validity." Appellant's Br. 34. For the reasons stated in the previous section, we are not persuaded that the scientific validity of APD is so patently lacking that consideration of it in a civil commitment proceeding violates due process.

**D.**

Finally, Mr. Brown contends that Dr. Doren's testimony was so unreliable that it would have been inadmissible in a federal proceeding under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). He urges us to

view *Daubert*'s standards for the admission of expert testimony as "a practical and appropriate proxy" for due process in this context. Appellant's Br. 38-39.

We are not persuaded by this argument. Mr. Brown points to no authority in which the *Daubert* standard has been imposed on states as a requirement of due process in any context, including criminal trials. Indeed, as we have stated on habeas review of a criminal conviction:

> Absent a showing that the admission of the evidence violated a specific constitutional guarantee, a federal court can issue a writ of habeas corpus on the basis of a state court evidentiary ruling only when that ruling violated the defendant's right to due process by denying him a fundamentally fair trial. The standard, then, is not whether the testimony satisfied the *Frye* [*v. United States*, 293 F. 1013 (D.C. Cir. 1923),] or *Daubert* tests—*neither of which purports to set a constitutional floor on the admissibility of scientific evidence*—but rather is whether the probative value of the state's evidence was so greatly outweighed by its prejudice to [the defendant] that its admission denied him a fundamentally fair trial.

*Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (citation omitted; emphasis added).

In our view, the real substance of Mr. Brown's request that this court view *Daubert* as the due process floor in this context merely echoes his claim that the diagnoses at issue are so lacking in scientific pedigree or so over-

inclusive that their use in his commitment proceedings violated due process. Having concluded that the diagnoses, as implemented in this case, satisfy the requirements set forth by the Supreme Court, the disposition of his secondary argument, cast as an evidentiary challenge, necessarily follows.

## Conclusion

As we have stated, "[t]he primary due process concern of the Supreme Court in the area of civil commitment is the necessity of distinguishing between the typical dangerous recidivist and the offender whose dangerousness is caused by some identifiable mental condition that impairs his ability to refrain from activity dangerous to others." *McGee*, 593 F.3d at 581. The State of Wisconsin acted within these bounds when it ordered the commitment of Mr. Brown as a SVP based on his diagnoses of paraphilia NOS nonconsent and APD. At his commitment trial, expert testimony supported the conclusion that he suffered from two "mental disorders" as defined by the Wisconsin statute, and that each of these disorders caused him to have an inability to control his sexually violent behavior. The diagnoses, although subject to some professional controversy, and the evidence upon which the diagnoses were based, provided constitutionally adequate bases under existing Supreme Court precedent to support Mr. Brown's commitment. Because Mr. Brown has not demonstrated that he is "actually innocent" of being a SVP, the default of his claims cannot be excused and, in any event, the claims fail on the merits.

Accordingly, the judgment of the district court denying the writ of habeas corpus must be affirmed.

AFFIRMED