**FILED**
**May 6, 2014**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Detention of: | ) | |
| | ) | No. 30853-7-III |
| | ) | |
| ERNESTO LEYVA, | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Ernesto Leyva appeals his civil commitment under the

sexually violent predator (SVP) statute, chapter 71.09 RCW. He raises constitutional

challenges to the SVP statute as vague, to the State's evidence as falling short of that

required by due process, and to the court's evidentiary rulings and instructions. Most of

his challenges are predicated on the fact that the State's evidence, in a commitment

proceeding that the State initiated when Mr. Leyva was 18 years old, was largely of

sexual misconduct he committed as a juvenile.

No scientific consensus supports Mr. Leyva's contention that sexual misconduct

committed as a juvenile is irrelevant in assessing a person's future inability to control

behavior. Because we find no error or abuse of discretion, we affirm.

FACTS AND PROCEDURAL BACKGROUND

The State filed a petition to commit Ernesto Leyva as a sexually violent predator[1] 6 months after his 18th birthday, in June 2009.

By age 18, Mr. Leyva had been charged with and pleaded guilty to the crime of indecent exposure occurring when he was age 14 and in the eighth grade, receiving 6 months of community supervision. Very shortly thereafter he exposed himself again, this time entering into a diversion agreement requiring community service. In 2006, he was charged with two counts of first degree child molestation for molesting two young girls at his church the prior year (also when he was age 14), to which he pleaded guilty to one count of child molestation in the first degree and qualified for a special sex offender disposition alternative (SSODA) sentence, provided by RCW 13.40.162. While staying with a family during the community treatment portion of his SSODA for the molestation conviction, he was arrested and charged with second degree rape of a 16-year-old daughter of the family. His SSODA was revoked and he ultimately pleaded guilty to rape in the third degree.

In addition to the conduct for which Mr. Leyva was criminally charged, these and other acts of sexual misconduct committed while in the seventh and eighth grades led to

---

[1] A "sexually violent predator" is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

his being suspended from school and later, after his fourth act of sexual misconduct, expelled.

Mr. Leyva was interviewed about his sexual history three times by Donald King, a law enforcement consultant. The first and second interviews followed Mr. Leyva's arrest on his third charge for a sexual crime; Mr. Leyva's defense lawyer engaged Mr. King to interview her client in support of the request for SSODA sentencing. The third interview was after the SSODA was imposed and Mr. Leyva was under the supervision of the Grant County Superior Court.

Mr. Leyva revealed to Mr. King that he had been sexually victimized by as many as three individuals. He had no recollection of the first, but had been told by his mother and pastor that a man who used to live in the family home might have molested him. He recalled the second: sometime between ages 5 and 7, he was molested by a 16- or 17-year-old neighbor girl who would undress him and engage in sexual touching. The third was at age 12, when he was molested by a 16- or 17-year-old boy with whom he engaged in penile/anal intercourse that was repeated a number of times thereafter. Mr. Leyva ultimately viewed it as consensual.

Mr. Leyva revealed to Mr. King that he had engaged in many other acts of sexual misconduct with two of his sisters and other children, for which he was never caught or charged. The misconduct included completed or attempted acts of vaginal and anal

3

intercourse, fellatio, digital penetration, exposing his erect penis, and touching girls on their breasts and buttocks.

A commitment trial under chapter 71.09 RCW was held in April 2012. The State presented the testimony of Mr. Leyva by video deposition and called, as other witnesses, Mr. King; Scott Ramsey, who served as principal of Mr. Leyva's junior high school during the time Mr. Leyva was in seventh and eighth grade; and its retained expert, Brian Judd Ph.D., a neuropsychologist.

Dr. Judd expressed his opinion that Mr. Leyva had a mental abnormality that made him more likely than not to reoffend if not confined to a secure facility. He told the jury that he had diagnosed Mr. Leyva with paraphilia not otherwise specified (NOS) (nonconsent) and had made a provisional diagnosis of exhibitionism and frotteurism. He testified that Mr. Leyva's condition affected his emotional or volitional capacity as evidenced by Mr. Leyva's reports that he could not help himself when tempted; had difficulty controlling his urges; and continued to offend even after being caught and punished, both judicially and nonjudicially.

Mr. Leyva called two witnesses in his defense: his father, Ernesto Leyva Sr., and his retained expert, Richard Wollert Ph.D. Dr. Wollert testified that Mr. Leyva did not fit the statutory criteria of mental abnormality or the requirements of difficulty controlling behavior and risk of reoffense. He testified that Mr. Leyva's sexual conduct before age 18 had all taken place during a period of psychosocial immaturity, when the decision

4

making and emotional control centers of his brain had not reached maturity. As a result, he testified, Mr. Leyva's conduct as a juvenile was not an indicator of his ability to exercise volitional control in the future.

The jury returned a verdict that the State had proved that Mr. Leyva is a sexually violent predator and the trial court entered an order of commitment. Mr. Leyva appeals.

## ANALYSIS

Mr. Leyva makes five assignments of error on appeal. He argues that (1) the SVP statute's definition and use of the term "mental abnormality" is unconstitutionally vague as applied to him, given Dr. Judd's diagnosis; (2) his commitment violates due process where it was predicated on his conduct as a juvenile; (3) the trial court violated his right to present a defense by limiting Dr. Wollert's testimony; (4) by permitting SVP commitment based upon a showing that a person "more probably than not" will engage in acts of sexual violence if not confined, the SVP statute violates the requirement of *Addington v. Texas*[2] that criteria for civil commitment be proved by clear and convincing evidence; and (5) the trial court's failure to provide a *Petrich*[3] instruction violated his right to jury unanimity.

We address his assignments of error in turn.

---

[2] 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).
[3] *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984).

No. 30853-7-III
*In re Det. of Leyva*

## I. Vagueness Challenge

"Freedom from bodily restraint has always been at the core of the liberty interest protected by the due process clause of the fourteenth amendment to the United States Constitution. Commitment for any reason constitutes a significant deprivation of liberty triggering due process protection." *In re Det. of Thorell*, 149 Wn.2d 724, 731, 72 P.3d 708 (2003) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992)). "The institutionalization of an adult by the government triggers heightened, substantive due process scrutiny. There must be a 'sufficiently compelling' governmental interest to justify such action, usually a punitive interest in imprisoning the convicted criminal or a regulatory interest in forestalling danger to the community." *Reno v. Flores*, 507 U.S. 292, 316, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993) (O'Connor, J., concurring) (quoting *United States v. Salerno*, 481 U.S. 739, 748, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)). The civil commitment of a sexually violent predator satisfies due process if the standards and procedure applied couple "proof of dangerousness with proof of an additional element, such as 'mental illness,' because the additional element limits confinement to those who suffer from an impairment 'rendering them dangerous beyond their control.'" *Thorell*, 149 Wn.2d at 731-32 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 358, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997)).

To commit an individual as a sexually violent predator, Washington's SVP statute requires that the State prove each of the following elements beyond a reasonable doubt:

6

"(1) That the respondent has been convicted of or charged with a crime of sexual violence; and
"(2) That the respondent suffers from a mental abnormality or personality disorder; and
"(3) That such mental abnormality or personality disorder makes the respondent likely to engage in predatory acts of sexual violence if not confined in a secure facility."

*Id.* at 742 (adapted from the Washington pattern jury instruction); RCW 71.09.020(18) (statutory definition of "sexually violent predator"); *cf.* 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 365.10, at 568 (6th ed. 2012) (WPI). "Mental abnormality" is defined by statute as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health or safety of others." RCW 71.09.020(8).

Mr. Leyva argues that Dr. Judd's testimony that Mr. Leyva suffers from "'paraphilia not otherwise specified, non-consent with the consideration and the rule out of pedophilia, sexually attracted to both, non-exclusive type,'" is a "compound diagnosis," not specified in the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* (4th rev. ed. 2000) (DSM-IV-TR), and "a determination of the expert's own creation." Br. of Appellant at 1-2. If the statutory definition of "mental abnormality" is deemed to include such a diagnosis, he argues that it is so lacking in ascertainable standards for enforcement that it is constitutionally vague as to him. A statute is unconstitutionally vague if it is "framed in

7

terms so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 739, 818 P.2d 1062 (1991) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926)). We review alleged constitutional violations de novo. *In re Det. of Strand*, 167 Wn.2d 180, 186, 217 P.3d 1159 (2009).

For decades, courts of this state and the United States Supreme Court have differentiated legal standards of culpability and dangerousness supporting civil commitment from professional standards of medical diagnosis, recognizing "the uncertainty of diagnosis in [the field of psychiatry] and the tentativeness of professional judgment." *Greenwood v. United States*, 350 U.S. 366, 375, 76 S. Ct. 410, 100 L. Ed. 412 (1956). Psychiatry "is not . . . an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness." *Ake v. Oklahoma*, 470 U.S. 68, 81, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985); *accord In re Pers. Restraint of Young*, 122 Wn.2d 1, 57, 857 P.2d 989 (1993) (the diagnosis of mental illness and disorder is not amenable to types of precise and verifiable cause and effect). The science of psychiatry therefore informs the court but does not control ultimate legal determinations. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002).

A constitutional challenge was made to Washington's SVP statute in *Young*—over 20 years ago, and shortly after the statute was enacted. One objection raised was that the statute failed to require proof that a respondent was both mentally ill and dangerous as required by substantive due process. The Washington Supreme Court acknowledged that *Addington*, *Foucha*, and other United States Supreme Court decisions dealing with commitment had spoken of a respondent's being "mentally ill" or "mentally disordered," while the Washington SVP statute required proof of a "'mental abnormality or personality disorder.'" 122 Wn.2d at 27 (quoting former RCW 71.09.020(1) (1990)).

The challenge in *Young* was to the State's reliance on a diagnosis of paraphilia NOS, which the court recognized as being a residual category in the then-current DSM-III-R,[4] and to the State's experts' testimony that the respondents whose commitment was at issue suffered from "'rape as paraphilia.'" *Id.* at 29. The court was not troubled by its residual category status:

> "The fact that pathologically driven rape, for example, is not yet listed in the *DSM-III-R* does not invalidate such a diagnosis. The *DSM* is, after all, an evolving and imperfect document. Nor is it sacrosanct. Furthermore, it is in some areas a political document whose diagnoses are based, in some cases, on what American Psychiatric Association . . . leaders consider to be practical realities. *What is critical for our purposes is that psychiatric and psychological clinicians who testify in good faith as to mental abnormality are able to identify sexual pathologies that are as real and meaningful as other pathologies already listed in the DSM.*"

---

[4] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders: DSM-III-R* (3d rev. ed. 1987) (DSM-III-R).

9

*Id.* at 28 (quoting Alexander D. Brooks, *The Constitutionality and Morality of Civilly Committing Violent Sexual Predators*, 15 U. PUGET SOUND L. REV. 709, 733 (1991-1992)). The court concluded that the statute was not so vague as to deny due process because "[t]he definitional section sets out precise standards, and defines 'mental abnormality,'" and "[a]s the record indicates, the experts who testified at the commitment trials adequately explained and gave meaning to this term within a psychological context." *Id.* at 49-50. It continued that "[t]he application of these standards to a particular set of facts is, of course, a determination for the factfinder, but the definitions provide sufficient guidance to do so properly." *Id.* at 50.

Despite this well settled law that legal standards for civil commitment are not rendered vague by controversies over medical diagnoses that inform the fact finder, Mr. Leyva takes issue with Dr. Judd's diagnosis of paraphilia NOS (nonconsent). He cites two decisions of the Seventh Circuit Court of Appeals as authority that the diagnosis is a "controversial" and "minimally sufficient" basis for commitment. Br. of Appellant at 18-19 (citing *McGee v. Bartow*, 593 F.3d 556, 579 (7th Cir. 2010) ("Even its most ardent advocates acknowledge that the diagnosis is 'probably . . . the most controversial among the commonly diagnosed conditions within the sex offender civil commitment realm'" (alteration in original) (quoting Dennis M. Dore, *Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond* at 63 (2002))); *Brown v. Watters*, 599 F.3d 602, 612 (7th Cir. 2010) (describing the diagnosis as "minimally sufficient for due process purposes")).

10

As the State points out, both decisions held that the diagnosis was, in fact, sufficient for due process purposes. *Watters*, summing up the court's conclusions in both cases, observed that "'a particular diagnosis may be so devoid of content, or so near-universal in its rejection by mental health professionals, that a court's reliance on it to satisfy the "mental disorder" prong of the statutory requirements for commitment would violate due process,'" but found, consistent with *McGee*, that "the diagnosis of paraphilia NOS nonconsent [does] not cross this line." 599 F.3d at 612 (quoting *McGee*, 593 F.3d at 577).

Division One of our court more recently rejected a defense argument that a *Frye*[5] hearing should be conducted before the State offered a diagnosis of paraphilia NOS (nonconsent) as a basis for confinement. *In re Det. of Berry*, 160 Wn. App. 374, 248 P.3d 592 (2011). *Frye* applies when a party seeks to admit evidence based upon novel scientific procedures. *Id.* at 379. As *Berry* points out, "[t]he courts of this state have repeatedly upheld SVP commitments based upon [the paraphilia NOS (nonconsent)] diagnosis" and Mr. Berry had demonstrated at most that there are critics of the reliability of the diagnosis, not that it is no longer generally accepted. *Id.* at 380. The court concluded that no *Frye* hearing was required and that due process was satisfied where

---

[5] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013, 1014 (1923).

Mr. Berry had the opportunity to cross-examine the State's expert and present his own expert to testify to shortcomings of the diagnosis.

Faced with this consistent authority that commitment on the basis of a diagnosis of paraphilia NOS (nonconsent) does not violate due process, Mr. Leyva argues that Dr. Judd's diagnosis was "rendered even more *unreliable*" because he appended a "rule-out" of pedophilia. Reply Br. of Appellant at 6.

Dr. Judd testified at trial that "rule out" means

> there was consideration of [the pedophilia] diagnosis and I believe that the evidence does support the diagnosis, but there may be some deviation from the criteria in some specific way which doesn't permit the full—making the diagnosis at that point in time.

Report of Proceedings (RP) at 209. He explained that he treated pedophilia as a rule out diagnosis because DSM-IV-TR criteria require that a pedophile is at least 16 years old and at least 5 years older than the objects of his fantasies, urges, or behaviors, while Mr. Leyva was not yet 16 when he offended against the 7 victims who were more than 5 years younger than him. According to Dr. Judd, pedophilia was properly included as a rule out diagnosis "[b]ecause I think it's important to—to clarify that there's consideration of a full range of diagnoses" and that when there was "some small deviation" from the DSM criteria it "is an obvious clinical consideration." RP at 211.

On cross-examination, Dr. Judd agreed that the DSM-IV-TR does not mention "rule out" diagnoses. He repeated that Mr. Leyva did not meet the criteria for pedophilia

12

under the DSM-IV-TR. He justified including the rule out diagnosis by pointing to discussion in the DSM-IV-TR about ways of indicating diagnostic uncertainty.

Dr. Judd's reason for identifying pedophilia as a rule out diagnosis was explained to the jury and Mr. Leyva had the opportunity in cross-examination to attack Dr. Judd for including it as part of his diagnosis. The rule out of pedophilia did not take Dr. Judd's otherwise sufficient diagnosis of paraphilia NOS (nonconsent) across the due process violation line.

*II. Due Process Implications of Commitment Based on Conduct as a Juvenile*

Mr. Leyva next argues that because his brain had not yet reached volitional maturity at the time of the misconduct relied upon by the State, it violates substantive due process for the State to rely on that misconduct as a basis for civil commitment. As discussed earlier in addressing Mr. Leyva's vagueness challenge, substantive due process requires that civil commitment be confined to persons shown to be both mentally ill and dangerous. *Hendricks*, 521 U.S. at 358. It is undisputed that the State must provide some proof that an individual has a serious lack of control over his or her behavior. *Thorell*, 149 Wn.2d at 735-36 (citing *Crane*, 534 U.S. at 413).

The State agrees it is a "widely-accepted premise" that a juvenile's brain is not fully formed and appears to develop until a person's mid-twenties. Br. of Resp't at 19. It disputes Mr. Leyva's contention that acts of sexual misconduct as a juvenile are not evidence bearing on a person's future inability to control behavior, however.

13

In arguing that the State presented constitutionally insufficient proof, Mr. Leyva

relies on three decisions of the United States Supreme Court: *Roper v. Simmons*, 543 U.S.

551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct.

2011, 176 L. Ed. 2d 825 (2010); and *Miller v. Alabama*, __ U.S. __, 132 S. Ct. 2455, 183

L. Ed. 2d 407 (2012). All were concerned with questions presented under the Eighth

Amendment to the United States Constitution when harsh punishment of crimes

committed by juveniles is prescribed or imposed without taking into consideration their

relative lack of volitional control.

In *Graham*, Justice Kennedy, writing for the majority, reviewed the scientific

understanding relied upon by the Supreme Court in *Roper*, as to which the high court

majority's view had not changed:

> [D]evelopments in psychology and brain science continue to show
> fundamental differences between juvenile and adult minds. For example,
> parts of the brain involved in behavior control continue to mature through
> late adolescence. Juveniles are more capable of change than are adults, and
> their actions are less likely to be evidence of "irretrievably depraved
> character" than are the actions of adults. *Roper*, 543 U.S. at 570, 125 S. Ct.
> 1183. It remains true that "[f]rom a moral standpoint it would be
> misguided to equate the failings of a minor with those of an adult, for a
> greater possibility exists that a minor's character deficiencies will be
> reformed." *Ibid.*

560 U.S. at 68 (second alteration in original) (citations omitted). In *Miller*, the court

indicated that the science and social science supporting findings that juveniles exhibit

transient rashness, proclivity for risk, and inability to assess consequences, had "become even stronger." 132 S. Ct. at 2464-65 & n.5.

Unlike the criminal prosecutions under review in the three Supreme Court cases, however, a civil commitment proceeding does not raise an issue of cruel and unusual punishment forbidden by the Eighth Amendment. A criminal prosecution is backward-looking and metes out an appropriate punishment, while a civil commitment proceeding is forward-looking in order to protect the public. A civil commitment proceeding looks back at a respondent's past as a source of relevant evidence—"either to demonstrate that a 'mental abnormality' exists or to support a finding of future dangerousness." *Hendricks*, 521 U.S. at 362. Because juvenile misconduct is only evidence and not a basis for punishment in civil commitment proceedings, current brain science raises a substantive due process issue only if it reveals that a respondent's inability to control sexual conduct while a juvenile is not relevant to his or her present or future inability to control behavior.

Mr. Leyva's expert, Dr. Wollert, subscribes to the view that conduct as a juvenile is not relevant. In the trial below and on appeal, the State has pointed to Dr. Wollert's policy paper entitled "'Juvenile Offenders are Ineligible for Civil Commitment as Sexual Predators,'" in which he argues that the American Psychological Association should take a stand against the civil commitment of juvenile offenders. Clerk's Papers (CP) at 399. At trial, he testified that "[j]uvenile only sex offenders are much different than adults,"

15

and that among the ramifications of their psychosocial immaturity is that they "are less likely to recidivate, no matter what their actuarial score, if one believes that an actuarial instrument is applicable." RP at 373. He cited several studies suggesting a low rate of recidivism for juveniles committing sex offenses.

The State's expert, Dr. Judd, disagreed. He testified to studies indicating that while some juveniles desist from offending as they reach adulthood, others do not. He testified that studies relied upon by Dr. Wollert as supporting low recidivism rates for juvenile offenders relied on too few years of follow up, and that longer-term studies had shown higher recidivism rates. Apart from overall rates of recidivism, he testified that risk factors associated with sexual recidivism in adolescents—risk factors that he contends are presented by Mr. Leyva—are similar to those that are associated with sexual recidivism in adults. When asked whether there was any literature in the field that said that the actuarial tools he had relied upon in assessing Mr. Leyva should not be used on individuals under the age of 23 because their brains are not fully developed, Dr. Judd testified that "[t]here is no literature that indicates that whatsoever." RP at 557.

To demonstrate a deprivation of due process, Mr. Leyva must back up his contention that evidence of sexual misconduct as a juvenile has no probative value in deciding whether a respondent presents a risk of reoffending if not confined in a secure facility. At best, he points to scientific evidence that juveniles' brains are in a state of maturation that increases their prospect of rehabilitation. That does not equate to

16

evidence that acts committed while a juvenile are irrelevant to assessing the risk of their future inability to control behavior.

Here, the defense had the opportunity to cross-examine Dr. Judd and to offer Dr. Wollert's testimony. That is all that due process required.

### III. Denial of Right to Present a Defense

Mr. Leyva next assigns error to the trial court's rulings limiting Dr. Wollert's testimony and striking a portion of his opinion expressed during trial.

Ordinarily, we review a trial court's ruling on the admissibility and scope of expert testimony for an abuse of discretion. *Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626 (1994). Mr. Leyva argues that in this case the limitations imposed on Dr. Wollert's testimony by the trial court denied his constitutional right to present a defense.

State rule makers have broad latitude to establish rules excluding evidence from criminal trials, but "[t]his latitude . . . has limits. 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984))).

Evidentiary rules can impermissibly abridge a criminal defendant's right to present a defense if they are "'arbitrary or disproportionate' and 'infringe[ ] upon a weighty interest of the accused.'" *State v. Rafay*, 168 Wn. App. 734, 796, 285 P.3d 83 (2012) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)), *review denied*, 176 Wn.2d 1023, *cert. denied*, 134 S. Ct. 170 (2013). The constitutional concern is with evidence that is relevant but excluded by rules that serve no legitimate purpose or that are disproportionate to the ends they are asserted to promote; a criminal defendant has no constitutional right to have irrelevant evidence admitted in his or her defense. *Scheffer*, 523 U.S. at 308; *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). Article I, section 22 of the Washington Constitution guarantees criminal defendants a right to present testimony in their defense that is equivalent to the right guaranteed by the United States Constitution. *See Hudlow*, 99 Wn.2d 1.

The State filed a pretrial motion in limine asking the trial court to exclude evidence of Dr. Wollert's political and legal view that "juvenile only" sex offenders should not be civilly committed because of his categorical view of their lack of volitional capacity. It asked that his testimony be limited to providing "an opinion as to whether Mr. Leyva has a mental abnormality or personality disorder that makes him likely to engage in predatory acts of sexual violence" and that he be required "to appl[y] the facts

18

of this case to his opinion under Washington law—as it is written today—not as he would like to see it in the future and not as he believes it should be." CP at 401.

The trial court granted the State's motion, ruling (among other limitations) that Dr. Wollert could not testify "regarding his political or legal opinion as to the eligibility of juvenile offenders for civil commitment," that the title of his paper should not be mentioned, and that he could not testify that an individual must have reached a "'baseline'" of developmental capacity in order to be an SVP. CP at 552-53 (boldface and capitalization omitted).

During his direct examination at trial, Dr. Wollert testified that

[p]sychosocial immaturity means that juveniles, those that commit the crimes as juveniles, have not reached volitional capacity. They can't suffer from something that affects their volitional capacity, because by definition of the developmental age, they're immature. So this shows how difficult it is to say that somebody who is a juvenile at the time they commit their crimes has an affected volitional capacity, because they never reached volitional capacity. It's for older persons.

RP at 385. The State objected to the testimony as violating the in limine order. The trial court heard argument from the parties outside the presence of the jury and then struck the testimony stating,

[Dr. Wollert] can't testify that juveniles can never have volitional capacity. He can testify that Mr. Leyva can't because he's a juvenile. . . . That's what would help the jury, that opinion, Mr. Leyva, not juveniles in general. And I'm finding that an expert can't give an opinion unless it's helpful to the jury, and his opinion about juveniles in general and his opinion about they can never have volitional capacity is not helpful to the jury. His opinion about Mr. Leyva being affected by his age is helpful.

19

RP at 390.

Mr. Leyva argues that the trial court's rulings prevented him from presenting evidence that would "defeat the State's claim of mental abnormality causing difficulty controlling behavior." Br. of Appellant at 37. He describes the testimony of Dr. Wollert that he was prevented from offering as being that

> [p]ersons of his young developmental age, by medical *definition*, have not yet reached the age at which a sexual paraphilia can possibly be diagnosed, because impaired volitional capacity and a consequent medical drive to act in a given sexual manner is *never* developed until a much later age.

Reply Br. of Appellant at 11. In other words, no one can be found on the basis of juvenile sexual misconduct, however repeated, to suffer from a mental abnormality or personality disorder which causes serious difficulty in controlling his sexually violent behavior: all juveniles have immature volitional capacity; hence, no juvenile's volitional capacity can ever be said to have been impaired.

Dr. Wollert's views to the contrary, Washington's SVP statute explicitly permits civil commitment on the basis of conduct committed as a juvenile. RCW 71.09.025(1)(a)(ii) requires agencies with jurisdiction over a juvenile in total confinement to notify the county prosecutor and attorney general three months before the juvenile's anticipated release if he or she committed a sexually violent act as a juvenile and "may meet the criteria of a sexually violent predator." RCW 71.09.030(1)(b) provides that a petition for civil commitment alleging that the respondent is an SVP may be filed when it

20

appears that "a person found to have committed a sexually violent offense as a juvenile is about to be released from total confinement."

Substantial authority allows a state to take sides in a medical debate, even when fundamental liberty interests are at stake and even when leading members of the profession disagree with the conclusions drawn by the legislature. *Stenberg v. Carhart*, 530 U.S. 914, 970, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000) (Kennedy, J., dissenting) (collecting cases). In *Jones v. United States*, 463 U.S. 354, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983) the petitioner, a paranoid schizophrenic, had been charged in the District of Columbia with petit larceny, to which he pleaded not guilty by reason of insanity. Under federal law, his insanity acquittal led to his being civilly committed. He later challenged his involuntary confinement and argued that his insanity acquittal was not predictive of future dangerousness, complaining that "'[w]hen Congress enacted the present statutory scheme, it did not cite any empirical evidence indicating that mentally ill persons who have committed a criminal act are likely to commit additional dangerous acts in the future'" and that the available research failed to support the predictive value of prior dangerous acts. 463 U.S. at 364 n.13 (alteration in original).

The Court responded that it did "not agree with the suggestion that Congress' power to legislate in this area depends on the research conducted by the psychiatric community," adding that it had "recognized repeatedly" the uncertainty of diagnosis in this field and the tentativeness of professional judgment. *Id.* The lesson drawn, the Court

21

said, "is not that government may not act in the face of this uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments." *Id.*

The same deference is accorded civil commitment laws enacted by state legislatures. In *Hendricks*, the Court stated that disagreements among psychiatric professionals

> do not tie the State's hands in setting the bounds of its civil commitment laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes. As we have explained regarding congressional enactments, when a legislature "undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation."

521 U.S. at 360 n.3 (citation omitted) (quoting *Jones*, 463 U.S. at 370).

As a matter of state evidence law, the trial court has discretion as to the admissibility of expert testimony and if the reasons for admitting or excluding the opinion evidence are fairly debatable the trial court's exercise of discretion will not be reversed on appeal. *Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 398, 722 P.2d 787 (1986). In reviewing Mr. Leyva's constitutional claim that he was denied his right to present a defense, we review whether the evidence Mr. Leyva sought to offer was relevant and was excluded for a reason that was arbitrary or disproportionate and infringed upon an interest on his part that was weighty. Under either standard, the trial court did not err in ruling that Dr. Wollert could not testify that no juvenile has a volitional capacity that can ever be said to have been impaired. It did

22

not err in striking the testimony that violated its in limine ruling. The testimony that Mr. Leyva sought to offer conflicted with the Washington SVP statute. The fact that Dr. Wollert disagrees with the legislature does not demonstrate that the statute reflects an unreasonable legislative judgment.

Although confident that the trial court's rulings were proper, we also note that any error would have been harmless. Dr. Wollert was given broad latitude to testify about brain development, the impulsivity and immaturity that contribute to criminal acts committed by juveniles, and the likelihood that once brain maturation has occurred, those same crimes will not be committed. He was allowed to testify to his reliance on studies of psychosocial immaturity by Dr. Laurence Steinberg. He testified that juveniles "reach psychosocial maturity over a protracted period," and that Mr. Leyva's history reflected that he committed his offenses because of that immaturity. RP at 396. He even testified that the theory of psychosocial immaturity was not specific to Mr. Leyva and in fact was a "general theory." RP at 494-95.

Evidentiary error warrants reversal only when there is a reasonable probability that the error materially affected the outcome at trial. *In re Det. of West*, 171 Wn.2d 383, 410, 256 P.3d 302 (2011). An exclusion of evidence that a defendant claims deprived him of the right to present a defense is harmless if the untainted, admitted evidence is so overwhelming as to necessarily lead to the same result. *State v. Lord*, 161 Wn.2d 276, 295-96 & n.17, 165 P.3d 1251 (2007). Given Dr. Wollert's extensive testimony, it is

23

highly unlikely that additional testimony from him would have materially affected the trial's outcome.

*IV. Showing That a Person "More Probably Than Not" Will Engage in*
*Acts of Sexual Violence If Not Confined As Violating* Addington v. Texas

In *Addington*, the United States Supreme Court held that due process requires that in a civil commitment proceeding, the State prove a respondent's required mental illness and danger to others by at least clear and convincing evidence. In his fourth assignment of error, Mr. Leyva argues that the statutory requirement that the State prove that a respondent's mental abnormality or personality disorder makes him or her "*likely* to engage in predatory acts of sexual violence if not confined in a secure facility," violates due process by imposing a lower burden of proof. RCW 71.09.020(18) (emphasis added). Elsewhere, the statute provides that the language "'[l]ikely to engage in predatory acts of sexual violence if not confined in a secure facility' means that the person *more probably than not* will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7) (emphasis added).

Our Supreme Court rejected this same argument more than a decade ago, pointing out that it confuses the burden of proof, which is the degree of confidence the trier of fact should have in the correctness of its conclusions, with a fact to be proved—which, in the case of this element, is couched in terms of statistical probability. *In re Det. of Brooks,*

24

145 Wn.2d 275, 297, 36 P.3d 1034 (2001), *overruled on other grounds by Thorell*, 149 Wn.2d 724. The court pointed out that "RCW 71.09.060(1)'s demand that the court or jury determine beyond a reasonable doubt that a defendant is an SVP means that the trier of fact *must have the subjective state of certitude in the factual conclusion that the defendant more likely than not would reoffend* if not confined in a secure facility." *Id.* at 297-98 (emphasis added). One of the "fact[s] to be determined" is "not whether the defendant will reoffend, but whether the probability of the defendant's reoffending exceeds 50 percent." *Id.* at 298. Yet the SVP statute still requires that the fact finder have the subjective belief that it is *at least highly probable* that this fact is true. *Id.*

Mr. Leyva acknowledges that *Brooks* rejected his argument but nonetheless asks that we reexamine *Brooks* in light of later federal and state case law recognizing that involuntary commitment is unconstitutional absent proof that an individual has serious difficulty in controlling behavior. He points to the United States Supreme Court's decision in *Kansas v. Crane* and our Supreme Court's decision in *Thorell.*

It is not this court's place to "reexamine" a decision by the Washington Supreme Court that it has not overruled. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (citing *Godefroy v. Reilly*, 146 Wash. 257, 259, 262 P. 639 (1928)). We would also point out that the decision in *Thorell* implicitly rejects Mr. Leyva's suggestion that the State's burden to prove an individual's serious difficulty controlling behavior has ramifications for the State's burden of proving that the individual is "likely to engage in predatory acts

25

of sexual violence if not confined in a secure facility." *Thorell* explicitly approves the language of a to-commit instruction similar to the pattern instruction in use at the time of Mr. Leyva's commitment trial. 149 Wn.2d at 742; *cf.* WPI 365.10. The instruction approved in *Thorell* includes the same "likely to engage in predatory acts" element to which Mr. Leyva objects and that he asks us to reexamine. Yet, according to *Thorell*, the instruction continues to pass constitutional muster "[b]ecause [it] requires the fact finder to find a link between a mental abnormality and the likelihood of future acts of sexual violence if not confined in a secure facility." 149 Wn.2d at 743.

### *V. Failure To Provide a* Petrich *Instruction*

Finally, Mr. Leyva contends that because Dr. Judd testified to provisional diagnoses of exhibitionism and frotteurism in addition to his diagnosis of paraphilia NOS (nonconsent), individual jurors might have relied for their finding of a mental abnormality on different evidence. Citing *Petrich*, 101 Wn.2d at 569, he argues that in the absence of an election by the State of the mental abnormality relied upon, the jury should have been instructed that it was required to unanimously agree on the mental abnormality.

Where a respondent in an SVP commitment proceeding elects trial by jury, commitment must rest upon a unanimous verdict. *Young*, 122 Wn.2d at 48; RCW 71.09.060(1). In criminal cases, the due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to

26

constitute the crime charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Washington law likewise requires the State to prove each element required for civil commitment of SVPs beyond a reasonable doubt. *In re Det. of Turay*, 139 Wn.2d 379, 407, 986 P.2d 790 (1999).

The manner in which the law safeguards these requirements at trial and on appeal depends upon where a particular determination by a juror fits in a hierarchy of the jury's decision process. On the ultimate issue of whether the crime charged has been committed, Washington law provides that jury unanimity be protected any time the State presents evidence of several distinct criminal acts but the defendant is charged with only one count of criminal conduct through one of two procedures: the State must either elect the act on which it will rely for a finding of guilt or the jury must be instructed that all 12 must agree that the same underlying criminal act has been proved beyond a reasonable doubt—what has come to be known as a "*Petrich* instruction." *Petrich*, 101 Wn.2d at 569.

Mr. Leyva's argument presumes that his civil commitment proceeding, like a "multiple acts" case, implicates the alternatives required by *Petrich*: State election of a specific act, or a unanimity instruction. But the alternatives required by *Petrich* have no application here. The purpose of the *Petrich* alternatives is to safeguard unanimity as to the ultimate verdict where there is a risk that some jurors will base their guilty verdict on one criminal act while others will base their verdict on a different criminal act.

27

The ultimate verdict the jury was required to reach in this case was whether the State had proved that Mr. Leyva was a sexually violent predator. While there was certainly the possibility that jurors could place more or less reliance on different pieces of evidence presented by the State, there was no risk that they would arrive at a verdict based on entirely different subject matters.

The alternative diagnoses offered by Dr. Judd were two steps removed in the decisional hierarchy from the multiple acts that were a concern in *Petrich*. An intermediate step in that decisional hierarchy are jury findings of elements that the legislature has provided may be proved by alternative means. Where alternative means are presented, the State is not required to elect a means nor does the jury need to be instructed that it must agree on the means. Unanimity and proof beyond a reasonable doubt are safeguarded by instruction on the elements and by substantial evidence review. In the case of these elements, however, we test whether the evidence was sufficient to prove each of the alternative means because we cannot know the means that individual jurors relied upon. *State v. Arndt*, 87 Wn.2d 374, 378, 553 P.2d 1328 (1976).

In *In re Detention of Halgren*, 156 Wn.2d 795, 811, 132 P.3d 714 (2006), the Washington Supreme Court held that having a "mental abnormality" and "personality disorder" are alternative means by which the State can prove the required element that the respondent in an SVP proceeding suffers from a mental abnormality or personality disorder. Accordingly—and not knowing which means individual jurors relied on—the

28

court conducted substantial evidence review for both means that had been presented by the State. Finding that there was substantial evidence to justify a finding beyond a reasonable doubt that Halgren had both a mental abnormality and a personality disorder, the court held that the trial court did not violate his right to unanimity.

An even more preliminary step in the hierarchy of juror decision making is the individual jurors' consideration of pieces of evidence, including their consideration of any means within a means that are offered to prove an element of the crime. As recognized in *In re Detention of Sease*, 149 Wn. App. 66, 201 P.3d 1078 (2009) and *In re Detention of Pouncy*, 144 Wn. App. 609, 184 P.3d 651 (2008), *aff'd*, 168 Wn.2d 382, 229 P.3d 678 (2010), the State's presentation in an SVP proceeding of diagnoses of multiple personality disorders or diagnoses of multiple mental abnormalities is means within a means evidence that does not implicate the requirements of *Petrich* or even the requirements of *Arndt*.

No *Petrich* instruction was required by the fact that Dr. Judd testified to both his primary diagnosis and provisional diagnoses.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

29

No. 30853-7-III
*In re Det. of Leyva*

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing J.

_____
Kulik, J.P.T.

30