In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3651

SCOTT R. SCHMIDT,

*Petitioner-Appellant,*

*v.*

DEBORAH MCCULLOCH, Director, Sand Ridge Secure
   Treatment Center,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-CV-00287-BBC — **Barbara B. Crabb**, *Judge.*

ARGUED FEBRUARY 16, 2016 — DECIDED MAY 26, 2016

Before POSNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* In 1990 the petitioner, Scott Schmidt, then 27 years old, was convicted in a Wisconsin state court of raping a woman multiple times, burglarizing her apartment, falsely imprisoning her, and intimidating her as a witness. He was sentenced to prison and paroled in 2003, but his parole was revoked five years later as a result of his having, in violation of its terms, viewed sexually ex-

plicit materials on the Internet and been expelled from a treatment program for sexually violent persons.

He was sent back to prison for another year and a half, and as his sentence was drawing to an end the state had him tried civilly on the ground that he was a sexually violent person as a consequence of mental disorder. The jury found him to be so and, as authorized by Wis. Stat. § 980.06, he was committed for an indefinite period to the Sand Ridge Secure Treatment Center, and there he remains. Sand Ridge detains persons who have a history of sexual aggression, and by detaining them shuts off their access to potential victims. It also provides treatment for the detainees, designed to provide them with a "safer return to the community"—safer in the sense that they will be less likely to commit sex crimes than they had been. In "Sand Ridge Secure Treatment Center— Mission Statement," www.dhs.wisconsin.gov/sandridge/mission-vision.htm (visited May 23, 2016, as were the other websites cited in this opinion), we read that

> The *FIRST* mission of Sand Ridge is to enhance public safety, which is accomplished by:
>
> - *R*esearching the causes and treatment of sexual violence.
>
> - *A*ssessing individuals for commitment purposes under the State's Sexually Violent Persons Law.
>
> - *T*reating and teaching patients and others with the goal of providing a safer return to the community for individuals with a history of sexual aggression.
>
> - *E*xercising custody and control over individuals in a manner that reduces the opportunities for sexually violent re-offending.

In 2014, having appealed the order of civil commitment unsuccessfully in the Wisconsin state court system, Schmidt sought federal habeas corpus. He claimed that his civil trial had violated his constitutional right to due process of law by presenting the jury with evidence of his past sexual misconduct the prejudicial effect of which outweighed its probative value. The district court dismissed the petition on the ground that Schmidt had failed to exhaust his remedies in the state judicial system, as required by 28 U.S.C. § 2254(b)(2), by presenting his federal due process claim in the state court.

He had invoked the exception to the requirement of exhaustion of federal claims for cases in which there has been a "fundamental miscarriage of justice." *Steward v. Gilmore*, 80 F.3d 1205, 1212 (7th Cir. 1996). That exception, however, "requires a claim that the defendant be actually innocent of the crime for which he or she is imprisoned," *id*., and Schmidt is not claiming to have been innocent of the crimes for which he was imprisoned back in 1990. His claim is that there was no basis for his civil commitment in 2010—that he wasn't too dangerous then to be given his freedom. That is a parallel claim to the conventional "actual innocence" excuse for procedural default, and close enough that we can assume that the excuse applies in the civil commitment context.

But the appeal argues not innocence, but that ineffective assistance of counsel, consisting of the lawyer's failure in the state civil proceeding to present a due process claim, excuses his forfeiture of that claim; the lawyer could have but failed to argue that the admission of evidence the prejudicial effect of which exceeded its probative value violates the due process clause. See, e.g., *Richardson v. Lemke*, 745 F.3d 258, 275–

76 (7th Cir. 2014). We'll proceed directly to the merits of the due process claim, because if it lacks merit he was not hurt by having forfeited it. See *Brown v. Watters*, 599 F.3d 602, 609–10 (7th Cir. 2010).

The due process issue is not whether Schmidt's treatment at Sand Ridge has equipped him to return to society; it is whether the jury's verdict in 2010 that he should be committed to Sand Ridge and remain there till it's safe to give him freedom should be invalidated on the ground that the trial which culminated in that verdict denied him due process of law. The claim is based primarily on the introduction at trial of statements, which he thinks his lawyer should have objected to vigorously, that Schmidt had made in the mid-1990s while he was in prison for his sexual aggression and undergoing sex-offender treatment there. A psychologist who testified as an expert witness for the state, and the defendant's parole officer, read portions of these statements to the jury. The statements describe in detail the sexual violence that he had committed before he was arrested and imprisoned. We quote the portions read at trial, minus questions by the lawyer directing the witnesses to specific paragraphs in the original statements:

> I will ask my victims if they ever had an orgasm. To kiss me, touch my penis and/or tell me to speed up or slow down. I feel a sense of relief if I ejaculated. I will untie the victim's hands as a phoney [sic] act of caring thinking I've done enough and I wonder if she will tell. I will look around her apartment for a purse or checkbook to steal hoping she fears I know her name, address and phone number therefore she'll be too scared to report me. I will threaten to hurt her or her family if she does. …

I expect my victims to enjoy being raped, to be submissive, to tell me how great I am and invite me back over after I rape them. I commit rape to feel powerful, superior, and in control. To degrade and humiliate my victims. To get even for all the perceived wrongs inflicted on me. For what I perceive, as teasing me and/or rejecting me. I tell myself females are property and sex objects for my own sexual gratification. …

Watching [her] remove her tops, I smile to myself. Lick my lips in anticipation and swallow hard. I feel aroused, controlling, powerful, and superior. I see a faint look of disgust on Brenda's face. I think, that's right, bitch, you're here for my pleasure now. You're getting what you deserve, my penis. I'm the boss now, you'll do as I say, and you don't want me to get pissed and start beating you, pulling your hair, and slapping you. …

Brenda kicks me hard in the chest then runs for the door. I fell off the back of her bed. Feeling angry I think, I got to get this bitch, and if she gets to the street, I'm screwed. Then I hear Brenda scream. I get up quickly and violently grab Brenda's throat. Clutching it very tightly and crushingly cutting off her air supply. Feeling nervous I think, someone will hear her scream and rescue her and I got to shut her up. With Brenda holding onto the screen door as tight [as] she can, I grabbed her arm forcibly and pull until she let[]s go. Then I drag her by her arm and throw her brutally back on the bed. Realizing Brenda was willing to run out of her apartment naked to escape I think, she's not good enough to get away from me. I feel powerful, controlling, superior and unique. …

Also, on one of my furloughs home, I burglarized a house in Elkhorn, Wisconsin. I went into a daughter's bedroom, took out a pair of her underwear, and laid them on her bed. Then I pulled my pants down and rubbed against

them until I ejaculated in them. I left them there, then left the house after stealing some money and a motorcycle. …

At age fourteen I was given weekend furloughs to go home. One or two visits went fine. Nothing really changed at home. My stepfather was still very mean. On my third furlough I ran away and attempted to rape a fourteen-year-old girl. I grabbed her by some woods, tripped her, and shoved my hands under her clothes. She fought me off and persuaded me to let her go. I did release her with a demand she meet me later that night. She never did meet me. I followed her home, then later that night, entered her house unannounced. Her mother was asleep on the couch. I startled her and she told me to leave. The next day, I went in a garage. A woman in the house walked her children to the bus stop, then returned. I knocked on her door, asked to use her phone, and showed her a knife that I previously found in a tackle box in the garage. She screamed and shut the front door—excuse me, she screamed and slammed the door shut. I ran off and threw the knife away. She never reported me. A day later I was caught stealing a motorcycle and attempting to break in a clothing store at Marantha Baptist Bible College. I returned to Ethan Allen School for Boys. …

Five female victims, ages 14 years old to 42 years old. Friends, neighbors and strangers. I vaginally and/or orally rape them. I use my hands, mouth and/or penis. I feel out of control, rejected, jealous and revengeful because of marital problems. I rape to get my control back and get my revenge on my wife. …

Three weeks before raping Brenda I watched her walk into her apartment from the store parking lot from across the street. I rape fantasized about her for three weeks prior to brutally raping her. I go to her apartment at 8:00 PM on April 9, 1990. I lied to her and asked to use her phone so I could call a friend who lived in the same apartment com-

plex as she did. I b[r]ought a knife and change of clothes to wear that night, put the knife in my back pocket before going into Brenda's apartment. I went there to violently rape her. Brenda was alone and trusted me to make a phone call and leave. While in her apartment I faked a phone call and attacked her on the bed. I raped her orally with my mouth and penis, vaginally with my mouth, penis and fingers and cruelly rubbed her breasts. I tied Brenda's hands up when she tried to escape and viciously grabbed her throat and choked her—and choked her when she would scream. I terrified her by intimidating her and threatening her with a knife. The rape lasted about ninety minutes. About three weeks later I was arrested after calling Brenda's apartment.

Despite the focus in this statement on his 1990 rape of Brenda, Schmidt had had an extensive prior history of sex crimes and sexual misconduct, as the state's expert witness in the civil commitment trial explained to the jury:

He kissed the mother of one of the male residents that he was a counselor for at the Carmelite Home for Boys. He made inappropriate sexual advances to the sister of one of the residents where Mr. Schmidt was the counselor. At the Lad Lake Home for Boys he had indicated to a [D]octor Gleason there that he raped one of the sisters of one of the male residents for whom he was acting as a counselor. He had a job as a freezer stocker but was terminated for making inappropri[a]te sexual advances toward a female driver. …

At age twelve he … burglariz[ed] a house and obtain[ed] the underwear of a young woman who lived there and masturbate[ed] to ejaculation with those undergarments. He then was placed in an East Troy foster home, this didn't work out well. He had inappropriate sexual contact with the daughter there of the foster home parents and he stole their snowmobile. His social worker decided

that this was serious enough to place him at the Boy's School at Wales for these behaviors.

It was also indicated in a police investigation that Mr. Schmidt had been photographed in 1987 by the White-water police department, approached approximately seven young women and asked them to pose for photographs. And even when he was in jail he apparently gave a note to a female cook saying that he [would like to] start a relationship with her and get to know her better even while in jail. These are the things that had been reported here.

During the course of treatment Mr. Schmidt has also reported a number of other issues having to do with his sexuality … . [H]e revealed that he had engaged in un-wanted—we call it frottage, it's a French term, it means rubbing against people that are unsuspecting for purposes of sexual gratification. … Mr. Schmidt had said that he had engaged in that here in Wisconsin ten times with female victims between the ages of ten and twenty-seven. He re-ported fondling their breasts, buttocks and vaginas with his hands and without consent. He also reported that he had raped five females between the ages of fourteen and forty-two who were friends, neighbors and strangers. These assaults never came to the attention of the authori-ties for one reason or another that I'm not privy to. During the course of these rapes he reported vaginally and orally raping the women by forcing penis to vagina intercourse or him performing oral sex on the victim. He also disclosed that he had engaged in voyeurism, window peeping, with twenty to thirty victims between the ages of sixteen and forty-two sometimes looking with binoculars through their windows, watching them undress and things of that na-ture. And he also said that he involved himself in exhibi-tionism with four females in the same age group and that he would either be completely naked or wearing light col-

ored shorts with no underwear so the victims could see his penis.

Schmidt no more denies the truth of this narrative than of his first-person statements, but argues merely that the prejudicial character of the first-person statements outweighed their truth value. That's a strange argument. The confession was the petitioner's voluntary statement, a classic admission against interest, which is why he could not and did not challenge its admission on hearsay grounds; nor is there any suggestion that it was coerced. It is the candid, unembarrassed—in fact proud and self-congratulatory—self-portrait of a sexual maniac, told in the first person, with no hint of guilt or remorse.

It's true that his confessions predated his civil commitment trial by about 15 years and the events recounted in them were at least 20 years old. His fixation on rape and other violence against women may have diminished by the time the trial was held. But he was free to submit evidence of this and attempted to do so. The attempt failed. The two psychologists who testified on his behalf have played so limited a role in the appeal that their names appear nowhere in the appellant's summary of their evidence. We're told only that "both experts scored Schmidt a three [on STATIC-99 or 99-R] and testified that they could not conclude that Schmidt was more likely than not to reoffend." STATIC-99 and 99-R categorize sex offenders on the basis of characteristics such as number of past convictions and type of victim, and report a rate of re-arrest or re-conviction for offenders in each category. One of Schmidt's experts inferred from these materials a 6 to 23 percent probability that Schmidt would commit another sex crime within 10 years (the expert thought the high-

er estimate more accurate) were he to be released now, and his other expert predicted a 24 percent probability. One testified that older offenders are less likely to re-offend and also that "successful completion of treatment certainly makes an individual less likely to reoffend." But the statistics are alarming.

The government's expert psychological witness, Dr. Christopher Snyder, predicted a re-offense probability of 45 percent within 10 years and 52 percent within 15 years—and added that those numbers were underestimates because many sex offenses are never detected. He acknowledged however that the numbers did not take into account an individual psychological assessment of Schmidt. And he did not explicitly address the relevance of Schmidt's statements to his likelihood of re-offense. But he offered the jury the following assessment of the likelihood that if released from confinement Schmidt would reoffend:

> Mr. Schmidt has what I would describe as a mixed paraphilic disorder. He has elements of a number of different specific paraphilias but when you put them all together it clearly rises to the level in my opinion of a paraphilic disorder. He has admitted to the inappropriate touching of people, bumping up against them and so forth. He has admitted to engaging in voyeurism, exhibitionism, having rape fantasies, having carried out several rapes, at least six that we're aware of. … [T]hese type[s] of paraphilic disorders, specifically the fantasies about rape predispose him to committing those kinds of acts in the future. … Antisocial personality disorders, like the personality disorders, involve a long-term ingrained pattern of behavior that conflicts with society, that causes difficulty in functioning, and in Mr. Schmidt's case antisocial personality disorder describes the type of personality disorder that he exhibits. …

But it's clear that Mr. Schmidt has these paraphilic urges and behaviors that we've discussed and he has the personality disorder which involves a lack of empathy, a lack of regard for the rights and prerogatives of other people. And a combination of these kinds of things together in my opinion predisposes him to do these type of acts.

Dr. Snyder also testified that "psychopathy is a more dangerous form of antisocial personality disorder" and that Schmidt has "a very high degree of psychopathic traits," a list that includes, he explained, "pathological lying, grandiose sense of self-worth, superficial charm, conning and manipulative, lack of remorse or guilt, promiscuous sexual behavior, early behavior problem, impulsivity, failure to accept responsibility, juvenile delinquency." He testified that people having such traits "tend to be extremely violent and they tend to recidivate much more rapidly" than offenders who do not have them. And "when the individual has sexual deviance and a high level of psychopathy … the research literature has identified this group of individuals who have these two distinct and separate problems as being in the highest group to commit new sexual offenses of any group we have yet been able to identify. … The actuarial instruments [such as STATIC 99] do not directly address this unfortunate combination. … [I]f I had an individual who had completed the [sex-offender treatment] program and then was actively fantasizing about raping the female staff members there and revealed that and was also revealing that information to a specific female staff member I would feel that … the offender needed a lot more work before they would be seen as having profited from treatment. … Research literature with psychopathic sex offenders and conventional sex offender treatment programs such as the program [the petitioner] was involved

in is very unclear [as to whether] psychopathic offenders profit at all from" such programs.

Dr. Snyder's skepticism was limited to the efficacy of attempts to cure *psychopathic* sex offenders. Concerning sex offenders more generally, the Justice Department—which one would not expect to downplay the difficulties of curing such offenders—notes that "findings from single studies of sex offender treatment conducted within the past 10 years remain somewhat inconsistent, but the weight of the evidence from more rigorous studies suggests that treatment—particularly cognitive behavioral approaches—can have a positive effect. … While there is agreement among researchers that the knowledge base is far from complete, the evidence suggests that certain therapeutic interventions for sex offenders can and do work. Specifically, cognitive-behavioral/relapse prevention approaches have been identified as being effective at reducing both sexual and nonsexual recidivism." Roger Przybylski, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Sex Offender Management Assessment and Planning Initiative*, Chapter 7: Effectiveness of Treatment for Adult Sex Offenders, Summary of Research Findings, www.smart.gov/SOMAPI/sec1/ch7_treatment. html.

Given the uncertainties regarding the efficacy of treatment of psychopathic sex offenders, Dr. Snyder may be right or wrong concerning the defendant's prospects for being cured, but he was a qualified expert witness and we do not understand Schmidt to be arguing that a reasonable jury could not have believed Snyder's testimony. The first-person statements that Schmidt challenges illustrate the psycho-

pathic traits that Snyder described, so they were pertinent to the jury's evaluation of whether Schmidt's predisposition to commit sexual offenses had changed in the preceding twenty years and whether the sex-offender treatment that he had undergone was likely to have reduced his risk of re-offense. And since Schmidt did not testify, the jury wasn't given a current view of his perspective on his behavior. And finally even studies that have found positive effects of sex-offender treatment acknowledge that a significant number of the treated offenders re-offend. See *id.* The uncertainty is especially great with respect to offenders who have mental disorders similar to Schmidt's. See Dennis M. Doren and Pamela M. Yates, "Effectiveness of Sex Offender Treatment for Psychopathic Sexual Offenders," 52 *International J. Offender Therapy & Comparative Criminology* 234, 243 (2008).

The essential point, however, given the focus of Schmidt's appeal, is that his constitutional rights were not infringed by the presentation at his civil commitment trial of the detailed first-person accounts of his sex crimes. The judgment of the district court is therefore

AFFIRMED.

HAMILTON, *Circuit Judge*, concurring in the judgment. I agree we should affirm the judgment dismissing Schmidt's petition for a writ of habeas corpus. I reach that conclusion by a different route addressing the procedural and substantive requirements for federal habeas corpus relief.

Schmidt's core constitutional claim is that he was denied a fair trial when the state's witnesses were allowed to read from Schmidt's own graphic accounts of his prior violent sex crimes against women. Schmidt had provided those accounts in the course of his treatment programs in state prison. He argues that reading the detailed, graphic, and emotionally powerful accounts to the jury denied him a fair trial because the evidence had so little probative value and was unfairly prejudicial to him. See generally *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (allowing victim impact evidence in penalty phase of capital case); *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986) (closing argument in capital case did not deny due process of law).

The district court dismissed Schmidt's petition based on procedural default, finding that he had not fairly presented his federal constitutional claim to the state courts. His counsel did not object at trial to this evidence. In his state court appeal, his counsel argued under state law that the trial was unfair and that a new trial would be in the interests of justice.

The question I believe we must first address is whether that argument "fairly presented" Schmidt's federal claim to the state courts under the rules of law that apply to federal habeas corpus petitions. See 28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 51 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365 (1995).

As we have explained in several cases, including *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001), presenting a state-law claim can sometimes suffice to present a parallel federal claim. Whether a particular presentation was sufficient depends on four factors: whether the petitioner (a) relied on federal cases that engaged in constitutional analysis; (b) relied on state cases that apply a constitutional analysis to similar facts; (c) framed the claim in terms so particular as to call to mind a specific constitutional right; and (d) alleged a pattern of facts that is well within the mainstream of constitutional litigation. The presence of any one of these factors, especially (a) and (b), is not necessarily enough to avoid default. Instead, the court must try to make a practical, case-specific judgment about whether the state court had a fair opportunity to consider the federal-law claim. *Kurzawa v. Jordan*, 146 F.3d 435, 441–42 (7th Cir. 1998); see also *Ellsworth*, 248 F.3d at 639 (three factors showed fair presentment of federal-law issue).

The last two of the four factors from *Ellsworth* apply to Schmidt's argument that admission of the graphic details of his confessions denied him a fair trial. It should have called to mind the federal constitutional right to a fair trial, and his claim that he was unfairly prejudiced by admission of such graphic evidence with little probative value was the sort of factual account that fits comfortably within the mainstream of federal due process litigation.

The state court of appeals said that Schmidt argued that "such evidence had low probative value and was substantially outweighed by its prejudicial effect," citing Wisconsin's counterpart to Federal Rule of Evidence 403, Wis. Stat. § 904.03. The state court also declined to address the case, as

the state had argued it should, in terms of whether Schmidt's trial lawyer failed to provide effective assistance of counsel under the Sixth Amendment by failing to object to the evidence at trial. Instead, the state appellate court addressed the merits of Schmidt's claim that the probative value of the evidence was substantially outweighed by its prejudicial effect. See Supp. App. 521 n.3.

It is not clear to me that our approach to fair presentment in the *Ellsworth* and *Kurzawa* line of cases would survive Supreme Court scrutiny under *Baldwin v. Reese* and *Duncan v. Henry*, for example, but I do not think we need to reach a firm conclusion on that issue, which is beyond the scope of the parties' briefs. The state should prevail on the merits.

The state court applied to Schmidt's case a standard more generous than would apply to the federal due process claim. In other words, he could not prevail on his federal due process claim without also satisfying the state-law standard for an unfair trial. The state appellate court considered and rejected the latter, implying rejection of the former.

Thus, even if Schmidt could overcome the fair-presentment problem and any other procedural obstacles, he would still not be entitled to federal habeas relief. On the merits, the state court's rejection of that (implicit) federal claim was not "an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The standard that was applied in *Payne* and *Darden* requires a court to do the difficult job of weighing probative value against unfair prejudice from the evidence. Schmidt cannot show that the state appellate court's affirmance of his commitment was an unreasonable application of that standard. As the majority opinion explains, the

evidence of Schmidt's own accounts of his past violent sexual assaults remained relevant in assessing the risk of future assaults and the conflicting evidence about the effectiveness of the treatment he had received in custody. Reasonable judges could find that powerful evidence was admissible, despite the risk that it would have unfair emotional impact.

Schmidt has argued for de novo review rather than the deferential review under § 2254(d)(1) because the state appellate court did not directly address the merits of the federal constitutional claim. The argument comes with a strong dose of irony, of course. Schmidt never raised the federal constitutional claim, at least explicitly, so it's no surprise that the state court did not address it explicitly.

The argument is creative, but it would be strange to say that a petitioner can avoid deferential review of state court decisions under § 2254 by presenting his federal claims only implicitly (but well enough for "fair presentment" under the *Ellsworth* line of cases), and then arguing the state courts failed to decide the federal issue on the merits. That approach would undermine § 2254(d), which makes clear that federal habeas corpus relief is "not a substitute for ordinary error correction through appeal" but is instead a "guard against extreme malfunctions in the state criminal justice systems," in cases where the state court's error is "beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

I would apply the *Richter* standard to say the state court's implicit rejection of the implicit federal constitutional claim was on the merits here, within the meaning of § 2254(d)(1). Applying the deferential standard of § 2254(d)(1), the denial

of relief to Schmidt did not involve an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, Schmidt is not entitled to federal habeas relief.